## UNITED STATES v. DUBRIN et al. *
### No. 43.

Circuit Court of Appeals, Second Circuit.
Dec. 6, 1937.

*Writ of certiorari denied 58 S.Ct. 644, 82 L.Ed. ——.

Ben Herzberg, of New York City, for appellant Louis Franco.

Irving Spieler, of New York City (George H. Combs, Jr., of New York City, of counsel), for appellant David Dubrin.

Paul Koch, of New York City, for appellant Harry Klein.

Irving Spieler, of New York City, for appellant Harold Klein.

John S. Leonard, of New York City, for appellant Arthur Elliott Myers.

Benjamin Siet, of New York City, for appellant Russell Van Wyck Stuart.

Emanuel Harris, of New York City, for appellant William C. Toomey.

Bushel & Gottlieb, of New York City (Samuel Gottlieb, of New York City, of counsel), for appellant David Weinstein.

Strauss & Abrahams, of New York City (Jerome A. Strauss, of New York City, of counsel), for appellant Joseph Winfield.

Lamar Hardy, U. S. Atty., of New York City (William Power Maloney and Gregory F. Noonan, Asst. U. S. Attys., and Wagner Mahlon Dickerson, Sp. Asst. U. S. Atty., all of New York City, of counsel), for the United States.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an appeal from a judgment of conviction for using the mails in furtherance of a scheme to defraud and for a conspiracy so to do. The scheme alleged in the indictment was inducing persons to purchase stock of Public Service Holding Corporation through false representations.

In 1927, one Haugh filed an application for letters patent upon a vehicle actuated traffic control device consisting of a pressure sensitive electrified detector imbedded in the highway which records the passage over it of vehicles and by means of resulting electrical impulses automatically sets the traffic signal at the next intersection against cross-traffic. The signal does not stop the traffic along the main highway except when there is cross-traffic. The system has gone into substantial use both in America and Europe.

Garland, a defendant in the present case, who was convicted but did not appeal, and one Stirlen, who had been associated with him in various enterprises, obtained an assignment from Haugh of his application to Automatic Signal Corporation which Garland and Stirlen organized under the laws of the state of Delaware in 1927. One hundred shares of its stock were then issued to Haugh and the remaining fourteen hundred to the Stirlen Corporation, which was organized by Garland and Stirlen as a holding company. Within a short time after the formation of Automatic Signal Corporation, it transferred various patent rights relating to the signal device to a corporation controlled by Garland, known as Engineering & Research Corporation, and received therefrom an exclusive license to manufacture and sell the device, but the license contained the provision that, in the event of bankruptcy or the appointment of a receiver of Automatic Signal Corporation, the license was to expire and all other rights under the contract to terminate.

During the year 1930 the business of the licensee had increased, but the outgo necessary for its expansion was increasing much more, and there was a deficit of about $700,000 with the prospect of a required expenditure of $1,000,000 for the ensuing year. By March 28, 1931, there was a deficit of about $1,000,000. Stirlen and Garland disagreed on the method of continuing to conduct the business in the face of the deficit and Stirlen at last sold out his interests to Garland about June, 1931. Shortly before this the Public Service Holding Corporation was incorporated by Garland and one Mason to take the place of the Stirlen Corporation as the main holding company for Automatic Signal Corporation and its subsidiary companies. The assets of the Stirlen Corporation, including stock control of Automatic Signal Corporation and its affiliated companies, were acquired by Public Service Holding Corporation in exchange for a block of the latter's stock. The authorized capital stock of Public Service Holding Corporation consisted of 10,000 shares of 7 per cent. cumulative preferred stock $50 par value; 30,000 shares common voting stock of no-par value; and 300,000 shares Class A common nonvoting stock. The voting stock was controlled by Garland at all times, who thus controlled the Automatic Signal Corporation and its various affiliates. In July, 1932, Garland entered upon the stock-selling campaign which ultimately resulted in the indictment. His purpose was to obtain money for the manufacture and marketing of the signal device.

Moscou, a defendant who pleaded guilty to the indictment, had a call on 2,000 shares of Public Service Holding Corporation class A common nonvoting stock which he had obtained from Garland and had been unable to sell. He was introduced by the defendant Weinstein to Henriques & Co., a brokerage concern doing business at 76 Beaver street. There he met the defendants Harry Klein, Dubrin, and Franco. Moscou was a broker with an office at 400 Madison avenue. He afterwards sold out his business there to defendant Arthur Elliott Myers, who continued business there under the name of Elliott Myers & Co. Moscou arranged to have Garland and Masongo down to the office of Henriques & Co., where they met Harry Klein, Weinstein, Dubrin, Toomey, and Henriques and discussed terms for marketing the Public Service Holding class A common nonvoting stock. There was evidence that Henriques was president, and Toomey vice-president, of Henriques & Co., and that Harry Klein, Dubrin, Weinstein, Henriques, and Toomey were interested in the concern. Henriques & Co. sold the Public Service Holding stock under an arrangement that netted Garland $5 per share, out of which he had to pay a commission of 50 cents per share to Moscou. The price obtained from the public was, however, $24 per share. It was thought that in case of an investigation by the New York Attorney General there would be a criticism of the spread between $5 and the brokers' selling price of $24 per share. Accordingly a "show" contract was drawn up and executed indicating that the selling price to Henriques & Co. was $16 instead of $5. Likewise the parties caused a so-called "kick back" contract to be executed by means of which the difference of $11 was returned to Henriques & Co. Henriques & Co. arranged with Harvey W. Sieg & Co., Inc., and Elliott Myers & Co., Inc., to market stock of Public Service Holding Corporation which Henriques & Co. had contracted to take. There was also proof that Joseph Winfield sold the stock at the same price of $24 and used the same method of sale as Henriques & Co. had done and employed on his staff men who at times were handling Public Service Holding stock transactions for Henriques & Co. and Elliott Myers & Co., Inc. Elliott Myers & Co., Inc., provided for "show" prices in ways similar to those employed by Henriques & Co. A "show" contract of Elliott Myers & Co., Inc., was actually exhibited to the agents of the State Attorney General after Elliott Myers & Co., Inc., was raided in 1933. After October, 1932, they had been dealing with Garland directly, and their "show" contract was intended to cover up the spread between the price of $5 which they paid to Garland and the price of $24 which they obtained from their customers.

The method of inducing purchases of Public Service Holding Corporation stock was to circularize persons holding stock in well-known corporations and to offer to advise them about their holdings. The advice in the end was that they should dispose of their stocks and invest in stock of Public Service Holding Corporation. Telephone salesmen using fictitious names worked in rooms of the brokerage offices. They induced customers to purchase listed securities, often more of the very ones the customers already held. Finally, they ad-

vised the customers to exchange their stock for that of Public Service Holding Corporation. The arrangements were concluded by other salesmen who interviewed the customers personally, using the fictitious names which had previously been given over the telephone. Thereupon the original stocks of the customer were sold by the brokerage houses and the proceeds credited to his account against his purchase of stock of Public Service Holding Corporation.

The earnings of Automatic Signal Corporation from the date of its organization to July 31, 1934, were only about $85,000. During that period its patent licenses, which had been at one time set up on its books at $32,500,000, were written down to $5,000,000, and the latter valuation was further reduced, by charging against it a deficit aggregating $1,095,000, to $3,905,000. The Automatic Signal Corporation is still selling its products at a small profit, but is the only one of the affiliates having a business of any value. Approximately one month before the trial of the present action the Automatic Signal Corporation declared its first and only cash dividend at the rate of three cents a share, which resulted in a dividend of 5 cents per share on the class A common stock to the stockholders of Public Service Holding Corporation. The Public Service Holding Corporation between the time of its organization in February, 1931, and February, 1935, had total net earnings of only $4,984.09. It paid out during the same period cash dividends on its preferred stock amounting to $11,145.76, stock dividends on its preferred stock amounting to $4,989, stock dividends on its class A nonvoting common stock amounting to $709,692.84, and stock dividends on its voting common stock of $106,327.62. On financial statements issued by the corporation during the period from February, 1932, to February, 1935, the capital and earned surplus items appeared at $360,785.44 for the first year, $675,993.10 for the second year, and $398,425.59 for the third year. In each year less than $5,000 consisted of earned surplus. The capital surplus consisted wholly of an arbitrary increase in valuations placed upon stock of subsidiary and affiliated companies.

The misrepresentations made to the purchasers of stock of Public Service Holding Corporation were that it would be listed on the New York Stock Exchange; that it would be listed at various figures from $30 up to $50 per share; that it would pay cash dividends; that it paid 6 per cent. dividends; that it would increase in price to $40 per share; that it was a good investment; that it was a better investment than National Dairy Company; that it was a better investment than Public Service Corporation of New Jersey; that it was a part of Public Service Corporation of New Jersey; that it could be sold by the purchasers at any time they desired for $24 a share; that George Henriques was a member of the New York Stock Exchange; and that he at one time had been president.

The shares were being sold at $24 per share out of an issue carried on the books at $18 per share and actually yielding the company but $5 per share and earning practically nothing.

■ The relation of the various appellants to the enterprise was as follows:

### David Dubrin.

The defendant Dubrin was an important personage in Henriques & Co. and apparently interested in the firm. Garland made an appointment for him to meet one Bowman and sell stock of the Public Service Holding Corporation to the latter at $24 per share. He solicited purchases of that stock from Bowman and also from one Witt. There is testimony that he also sold such stock to Doughty, Bosseler, and Speath under assumed names. He took part in the negotiations leading to the deal between Garland and Henriques, and with the aid of the defendant Weinstein mulcted a customer named Kunz out of about $10,000 of securities.

■ Dubrin, moreover, sold stock of Central Commonwealth Service Corporation belonging to Garland through Gregory Hughes & Co., a concern formed by Franco, which had a "show" contract with Garland similar to the one made by Henriques & Co. The transactions were similar to those used in the sales of Public Service Holding Corporation stock and thus bore on the motives of Dubrin in the case at bar. United States v. Shurtleff, 43 F.2d 944 (C.C. A.2).

■ The statement of the district attorney to Dubrin that he would be glad to talk to the latter without, however, giving any assurances should Dubrin choose to plead guilty to the present indictment or to the indictment pending in the Central Commonwealth case, even if originally improper, was

rendered innocuous by the charge of Judge Knox to disregard other indictments pending against the defendants.

### Louis Franco.

Franco organized Elliott Myers & Co. He and his partner Moscou hired the salesmen and fixed their commissions. When the firm was being investigated, he instructed the employes how to testify before the Attorney General of New York and urged them to move and leave no forwarding addresses when the concern closed. He himself fled as the Attorney General's men raided the offices. Thereafter he formed Gregory Hughes & Co. In it Dubrin worked as well as Levinson and Rose Schwartz, who had previously been employed by Elliott Myers & Co. Similar methods were used in selling stock of Central Commonwealth Service Corporation, including a "show" contract displaying a fictitious price, that had been employed in marketing Public Service Holding Corporation stock by Elliott Myers & Co.

■ The criticism is made, as in the case of Dubrin, that the indictment in Central Commonwealth should not have been referred to by the district attorney, but, if this was originally erroneous, we think the prejudice was removed by the charge of the court to disregard it.

### Harry Klein.

The defendant Harry Klein was general manager of Henriques & Co. and was active in the negotiations leading to the contracts between Garland and Henriques & Co. and between the latter and Harvey W. Sieg & Co. He largely managed Henriques & Co. and apparently had a proprietary interest in it. He looked over the circulars, directed the employees, and made arrangements to have the employees assemble at the office of the attorney for the concern when they were to be examined by officials from the State Attorney General's office. He was present when the method of marketing the Public Service Holding Corporation stock was outlined, including the employment of "show" and "kick back" contracts. We feel no doubt that there was enough to establish his connection with the mail frauds and the conspiracy.

### Harold Klein.

The defendant Harold Klein was cashier and bookkeeper for Henriques & Co. He also assisted on the books of Harvey Sieg & Co., with which Henriques & Co. had a profit-sharing arrangement. Certain deposit slips for the account of Henriques & Co., in Harold Klein's handwriting, included some of the "kick back" checks. There was testimony that, when Elliott Myers & Co. were selling Public Service Holding Corporation stock, the real price payable in cash to Henriques & Co. was placed in an envelope, a telephone call was then given to Henriques & Co., usually to Harold Klein, whereupon a messenger boy from Elliott Myers & Co. took with him in addition to the cash an order reporting a sale at the "show" price. It is quite impossible that Harold Klein could have kept the books of Henriques & Co., who were employing the "show" contract and "kick-back" contract, without obtaining knowledge of and aiding the perpetration of the frauds. We think the evidence was sufficient to justify his conviction.

### Arthur Elliott Myers.

The defendant Arthur Elliott Myers was president of Elliott Myers & Co. and a holder of 50 per cent. of its stock when it was organized and Schmidt was the holder of the remaining 50 per cent. The real owners were Moscou and Franco, but Myers appeared before the Attorney General of New York and falsely stated that he and Schmidt were the owners. Moscou testified that Myers had a salary of $35 or $40 per week and about 10 per cent. of the net profits. One of the customers of Elliott Myers & Co., Louise Hammer, testified that she talked with Myers, who advised her to purchase Public Service Holding Corporation stock. Irene E. McFaul also purchased stock of Standard Brands and, on Myers' advice, sold it and bought Public Service Holding Corporation. He told her that it would be "on the big board in about a month or so" and that she would make a great deal more money than in Standard Brands. Rose Schwartz testified that Myers was at the office "every day," that he dictated the letters to customers and instructed her about the details of the pay roll sheets and signed the pay roll and other checks in evidence and distributed the cash for pay rolls among the employees. There can be no doubt that the proof was sufficient to justify Myers' conviction.

### Russell Van Wyck Stuart.

■ The defendant Russell Van Wyck Stuart wrote the bulletins and market letters which were sent out by Henriques & Co. Apparently they were intrinsically much

like the ordinary literature coming from reputable brokers' offices and they did not mention stock of Public Service Holding Corporation. But they undoubtedly furnished the necessary bait to enable Henriques & Co. to switch customers from conservative investments to stock of the Public Service Holding Corporation. Stuart had a room and a stenographic force in the office of Henriques & Co. and was paid to do his work by them. There was proof that Henriques & Co. dealt in good securities so that they did maintain, or might have maintained, their statistical department for purposes other than to induce customers to switch from standard securities into Public Service Holding Corporation stock. Without more proof that Stuart was aware of a fraudulent purpose in maintaining his department, it seems to be going too far to allow a jury to find that he was consciously participating in a scheme to defraud.

### William C. Toomey.

The defendant William C. Toomey was vice-president of Henriques & Co. and occupied offices at their place of business with his name on the door. He received a salary of $50 per week. He signed outgoing mail for the concern, including a letter · acknowledging receipt of an order for 95 shares of Public Service Holding Corporation stock and letters to customers containing stock of that company, countersigned checks for Henriques & Co., gave orders to the secretary, and received complaints from customers. The customer Ranney testified that Toomey told her that Public Service Holding Corporation stock was "coming along" and was "waiting the time it should be listed at a high price." The witness Bosseler testified that Toomey falsely told him that Mr. Henriques was at one time president of the Stock Exchange and that Henriques & Co. were members and that he recommended the purchase of Public Service Holding stock. Toomey told a customer named Frenger that Public Service Holding Corporation stock would have "a more glowing future" than Chrysler stock. Toomey was at various early conferences with Klein and Henriques. While there was no proof that he operated under a fictitious name, as various persons connected with Henriques & Co. appear to have done, he was much too important a figure in Henriques & Co. not to have had knowledge of, and to have been connected with, its fraudulent acts.

In our opinion, there was enough proof to justify his conviction.

### David Weinstein.

The defendant David Weinstein was connected with Henriques & Co. He told Moscou that he was a partner of Harry Klein. He took part in the negotiations leading to the deal between Garland and Henriques & Co., during which the method of selling Public Service Holding Corporation stock, including the employment of a "show" contract, was discussed. (Folios 455–465.) Ruth Speath identified him as having sold Public Service Holding Corporation stock to her under the name of Chester. She said he told her the stock was a very good stock selling at $20 per share and that it would be listed. He collaborated with Dubrin in mulcting a customer named Kunz out of about $10,000 of securities.

The testimony indicates that he left Henriques & Co. about October, 1932, but there is no proof that he repudiated or withdrew from the conspiracy. So far as the evidence shows, he may have remained in the enterprise, though he had apparently ceased to be active. Accordingly the three-year statute of limitations (18 U.S.C. A. § 582) had not run and his indictment was not barred. Hyde and Schneider v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas.1914A, 614; Local 167, International Brotherhood of Teamsters v. United States, 291 U.S. 293, 54 S. Ct. 396, 78 L.Ed. 804.

### Joseph Winfield.

The defendant Joseph Winfield maintained an office in New York City, during 1932, 1933, and 1934, from which he made sales of Public Service Holding Corporation stock at $24 per share. One of his employes, Max Silver, who pleaded guilty in the present case, was first employed by Elliott Myers & Co., and, when that concern ceased to do business, interviewed Harry Klein at ·Henriques & Co. with reference to getting another job. Klein asked him if he wanted to go to work for Winfield & Co., to which Silver replied in the affirmative, whereupon he testified that Klein said to him to go up there and speak to Mr. Winfield. He was employed by Winfield & Co. and remained with them for a few weeks.

Gerald Owens, who also had been a salesman for Elliott Myers & Co., after it

ceased to do business, was sent by Schmidt, the vice-president and part owner, to work in a similar capacity for J. Winfield & Co. He testified that J. Winfield & Co. had a telephone room and that his routine was the same as in Elliott Myers & Co. After working with Winfield & Co. for a while, he was recommended by the latter to Henriques & Co., where he met Harry Klein and was employed to take over the duties of William C. Toomey, who was then ill.

Francis McLean Smith had been associated with Henriques & Co. and had acted as a dummy in receiving checks under the "show" contract known, as "kick back" checks which were returned to Henriques & Co. as part of the profit which they realized from their sales at $24 per share. He acted under the assumed name of Paul Sterne. After January, 1933, he went into the employ of Winfield & Co. and appears to have received from them a check for $12,600 which was deposited in his account in the name of Paul Sterne with the Brooklyn Trust Company in which certain socalled "kick back" checks were deposited.

J. Winfield & Co. sold stock of Public Service Holding Corporation at $24 a share to Simpson, Conklin, Struensee, Baker, and Schmidt. False representations in regard to the stock and its prospects were proved in connection with the sales to Conklin, Struensee, Baker, and Schmidt. J. Winfield & Co. were plainly receiving an exorbitant price from their customers. The sales of the stock to dealers, of which we have any evidence, were generally at only $5 per share and at most at only $7 per share, but J. Winfield & Co. purchased the shares which they sold to Struensee and Baker in 1934 from a dealer named Dunne at $2.25 per share.

It may be that J. Winfield & Co. were acting as agents for Henriques & Co. and that the $12,600 check to Sterne was a payment which was to be transferred by him to Henriques & Co., but, whether this be so or not, the jury was justified in finding that in the case of various sales the customers of J. Winfield & Co. were induced to part with their property by fraudulent misrepresentations either by salesmen of Winfield, or by himself, and that the letters referred to in the indictment arising out of the transactions of J. Winfield & Co. were mailed in pursuance of a scheme to defraud. The unexplained sales of Public Service Holding Corporation stock by J. Winfield & Co., of which the defendant Winfield was the owner, at the same price which Henriques and Garland had fixed, and the constant interchange of salesmen among the houses of Henriques & Co., Elliott Myers & Co. and J. Winfield & Co., were also, in our opinion, sufficient evidence to justify the jury in finding that Joseph Winfield participated in the conspiracy alleged in the indictment.

As a result of the foregoing, we hold that there was sufficient evidence to justify the verdict of guilty as to all the defendants except Russell Van Wyck Stuart.

It is argued by some of the defendants that it was error to compel a trial by jury inasmuch as at the opening of the case all of them formally placed upon the record a waiver of such a trial. A motion was thereupon made that the jury be dispensed with and that the court alone try all the issues of fact and law. This motion was denied, the court ruling "that in view of the prosecution's refusal to stipulate for the waiver of a jury it was unnecessary for the court to exercise any discretion in the matter. * * *" In Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 74 L. Ed. 854, 70 A.L.R. 263, the Supreme Court held that an accused on trial in a federal court could waive a jury in all criminal prosecutions whether for a felony or a misdemeanor. Justice Sutherland, who wrote the opinion, stated (281 U.S. 276, at page 312, 50 S.Ct. 253, 263, 74 L.Ed. 854, 70 A.L.R. 263) that "before any waiver can become effective, the consent of government counsel and the sanction of the court must be had, in addition to the express and intelligent consent of the defendant." In view of this explicit pronouncement, we cannot say that it was error of the trial judge to decline to try the case without a jury.

The main grievance of defendants' counsel is based on the alleged misconduct of the counsel for the government at the trial. The latter made some statements not justified by the record, and at times did not show proper self-restraint, but we find nothing which justifies us in upsetting the verdict, especially in view of correction by the experienced trial judge of any excesses on the part of the counsel. Careful consideration of the briefs and the record leads us to the conclusion that the judge kept the case so well in hand that the ebullitions of counsel resulted in no

prejudice and that, even aside from this, their importance was more imaginary than real.

■■ The complaint about the admission of a card taken from the Rogues' Gallery having the picture of Frank McLean Smith is not impressive. Technically it identified the man who had opened the bank account in the name of Paul Sterne, doubtless for the purpose of concealing the "kick back" payments which were being routed back to Henriques & Co. through him. We cannot say that the admission of the card was erroneous or really important. Nor do we think it was prejudicial to the other defendants. Smith, alias "Paul Sterne," though a defendant, was not on trial and the card only related to him. Moreover, the judge told the jury that: "The notations on this card * * * are not in evidence against any of the defendants or evidence against him." The home relief application containing Smith's signature was admitted as a means of enabling the government to establish his handwriting and identify it on other writings, proof of which might be needed. The court charged that it was only to be considered as a sample of his handwriting.

■ Dubrin has contended that his character was improperly put in issue by Miss Myers' testimony that some person at the conference of employes held before meeting the officials of the New York Attorney General's Office told her, if possible, to avoid mentioning Dubrin's name "because his background was not very, very nice." No objection was made to Miss Myers' testimony on the ground that it was an improper attack on Dubrin's reputation, and the statement as to him was altogether too vague and unimportant to constitute reversible error.

■ The reference to Smith as a "jail bird" and a "three times convicted felon" was unsubstantiated, but it was corrected by the court and the jury was in substance told to disregard it. (Folio 4460.) It was an attack on a defendant who was not on trial and only could prejudice other defendants because of possible implications arising from their supposed evil association. Such implications are too remote to furnish ground for reversal certainly where, as here, the statements of counsel were corrected by the trial judge. The reference in the summation of government's counsel to the defendant Weinstein as hiding behind the statute of limitations was clearly objectionable. But this was dealt with by the trial judge in his charge so that there was no error in law. If we thought that the relatively unimportant ebullitions of government's counsel, though corrected by the judge, had created a real prejudice, we should, of course, grant a new trial. But the fraud of the defendants in loading their customers with Public Service Holding Corporation stock at $25 per share when it had only cost the dealers $5 to $7 per share, and in some cases even less, is so plain that it precludes a reversal because of a few emotional outbursts.

The situation in the case at bar is quite different from that in Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314. The government's proof there was much weaker, the acts of its counsel were persistently objectionable, and the court failed to exert any such control over the trial as Judge Knox exercised here. The attempt to turn this trial of men whose guilt was abundantly proved into a trial of government's counsel, though a not infrequent expedient of defendants who have no other recourse, ought not, in our opinion, to succeed.

Judgment affirmed as to all appellants except Russell Van Wyck Stuart, and reversed as to the latter.