**C. I. T. CORPORATION et al. v. UNITED STATES.**

No. 10626.

Circuit Court of Appeals, Ninth Circuit.

May 28, 1945.

Rehearing Denied June 29, 1945.

Bonsted & Nichoson, of Yakima, Wash., R. E. Lowe, of Spokane, Wash., H. F. Birnbaum, of Los Angeles, Cal., and Cravath, Swaine & Moore, of New York City (Wm. Dwight Whitney, and John F. Dowd, both of New York City, of counsel), for appellant C. I. T. Corporation.

Joseph C. Cheney, Elwood Hutcheson, and John Gavin, all of Yakima, Wash., for appellant Thomas.

Edward M. Connelly, U. S. Atty., and Harvey Erickson and Frank Freeman, Asst. U. S. Attys., all of Spokane, Wash. (Charles Burdell, Sp. Asst. to Atty. Gen., of counsel), for appellee.

Before DENMAN, HEALY and BONE, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal from a judgment and sentence for conspiracy under 18 U.S.C. §§ 83, 88, 18 U.S.C.A. §§ 83, 88, to violate § 1731 of 12 U.S.C., 12 U.S.C.A. § 1731, of the National Housing Act, 52 Stat. 24, 25. The pertinent portions of the Act so charged to have been conspired to violate are "(a) Whoever * * * for the purpose of influencing in any way the action of said Administration under this chapter, (makes, passes, utters, or publishes, or *causes to be made, passed,* uttered, or published any statement, knowing the same to be false, * * *) or willfully overvalues

any security, asset, or income, shall be punished * * *." (Emphasis supplied.)

The Federal Housing Administration promulgated and published in the Code of Federal Regulations the forms of documents to guide the Administration in the acceptance of loans for the insurance provided in 12 U.S.C.A. § 1703, 12 U.S.C.A. § 1703. Pertinent portions of the Regulations are

"§ 501.6 *Credits.* (a) The insured institution shall obtain a signed and dated credit statement-application from the borrower, on a form approved by the Administrator. The credit statement-application must, in the judgment of the insured institution, clearly show the borrower to be solvent, with reasonable ability to pay the obligation and in other respects a reasonable credit risk.

"(b) A separate credit statement-application is required in connection with each loan made or note purchased.

"(c) An insured institution *acting in good faith* may rely upon the statement of the borrower who signs the credit statement-application * * *." (Emphasis supplied.) Code of Federal Regulations, 1939 Supp., Title 24, pp. 1408, 1409.

It is apparent that the crime of conspiracy charged is committed when, as an overt act pursuant to the conspiracy, a credit statement-application, in the form prescribed by the regulations, but "knowing[ly]" falsified and thus not in the "good faith" of the regulations, is made for the "purpose" of *passing* it on to the Administration.

The parties here charged with the conspiracy are the C. I. T. Corporation, hereinafter called the money lender, seeking to expand its interest income with loans at interest exceeding 9% to borrowers with limited or doubtful credit, seeking long-term 3-year installment loans not to exceed $2,500 each; and certain dealers and their agents, seeking profit in the sale of household implements and materials for household improvements to the borrowers and to be paid for with the borrowed money.

The motivation for the charged crime of conspiracy to make and pass on falsified credit statement-applications stating the credit standing of the borrowers for the purpose of obtaining the government insurance provided in the National Housing Act is apparent. The prospective expansion of loans at the high rate of interest, in an over-supplied money market, to be

procured by the falsified credit statement-applications, would yield a large profit to the money lender with the protection of the lender by the government insurance of all the unpaid principal and interest of each loan up to 10% of the total of such loans. The dealer would make his profit on the expanded sales for the money loaned on documents which the dealer, with the connivance of the money lender, falsified by untruthful statements in the credit application form of regulation 501.6.

### The money lender's appeal.

■ The money lender had a contract with the Federal Housing Administration which insured the repayment of loans and advances of credit made in accordance with the terms and conditions set up by the Administrator under the Act. To procure its Federal Housing insurance of its loans in an expanded loan drive in Yakima, Washington, and adjacent territory, the money lender made one Lou Wilkins, its manager for that area, its representative to exercise its "good faith" obligation to the Administrator in the procuring from borrowers their credit statement-applications. These applications were required by regulation 501.6, supra, to show "the borrower to be solvent, with reasonable ability to pay the obligation and in other respects a reasonable credit risk."

As to be expected, and as provided for in the regulations,[1] such a loan drive would be by co-operation of the money lender's manager and the dealers in household implements and supplies. Manager Wilkins co-operated with such dealers, among others, P. A. Thomas and J. Q. A. Price, officers of a furniture store in Yakima, doing business under the name of Thomas & Price. It was part of their business to sell furnaces and hot water heaters, these items being eligible equipment for property improvement loans under the Act. Herm G. Link was sales manager for Thomas & Price.

Manager Wilkins was pressed by other officers of the money lender in what are called "pep talks" in the vernacular of lending and vending and by a criticism that he was too severe in his credit ratings. His drive for loans was successful. Thomas & Price increased from approximately five to twenty-six their solicitors for credit statement-applications from prospective borrowers and purchasers of their goods with the borrowed money.

The money lender supplied the dealer's solicitors with the blank forms of credit statement-applications. Each applicant disclosed the intent to secure the FHA insurance. Each began with the words "The following information, including the reverse side hereof and made a part hereof, is furnished for the purpose of inducing you to grant credit under the terms of Title I of the National Housing Act." These were taken to prospective customers and borrowers to be filled out. The solicitors were told that they were not to concern themselves with the value of the customer's credit.

There is abundant evidence that Manager Wilkins and Sales Manager Link "knowing[ly]" "caused to be made" the credit statement-applications for the Administrator in the following manner in some twelve transactions. Under Wilkins' and Link's instructions the solicitors procured the signatures of the borrowers on the application forms, leaving blank spaces for the borrowers' credit statements. The solicitors wrote down these statements on separate pieces of paper, telling the borrowers that the applications' credit statements would be filled in later.

The solicitors turned over the signed unfilled applications and the sheets with the credit statements to Link. He with Wilkins studied the statements and in some of the transactions thought them not sufficient to satisfy the requirements of regulation 501.6—the regulation for the guidance of the Administrator for the insurance of the loans. Link, with Wilkins' knowledge, then proceeded to substitute in the blank spaces of the signed application forms more favorable, but false facts, as to the credit status of the borrowers. Link turned over to Wilkins the borrowers' notes and the falsified applications, which were accepted as if they were truthful by the money lender's manager—that is by it in bad, not good faith.

As we construe 12 U.S.C. § 1731, 12 U.S.C.A. § 1731, and regulation 501.6, the crime of conspiracy knowingly to make false applications "for the purpose of influencing * * * the action of said [Federal Housing] Administration" in insuring the loans sought by the applications was committed at this acceptance of the application by the money lender. In the language of the statute it then "makes" a "statement, knowing the same to be false" for the purpose of

---

[1] Considered infra in the Appeal of P. A. Thomas.

procuring the insurance from the Administrator.

The money lender's brief admits that it delegated to Manager Wilkins not only the corporate function of procuring the applications but also of purchasing the borrowers' notes to be insured by the Administration. This was done in each of the twelve transactions.

A second overt act, with the same bad faith, was performed by the money lender's manager when he *passed* the falsified applications on to go through other corporate officers on their way to secure the FHA insurance referred to in the statements.

It appears that no other officer or agent had the corporate function of determining the truth or falsity of the credit statement-application. That good faith function of the corporation required by regulation 501.6 was delegated entirely to Manager Wilkins. Other officers at the regional office in San Francisco, California, had the function of determining whether the loan should be further *passed* on to the Administrator. In a ratio of one in twenty applications, they made an investigation of another statement required by the regulations relative to the completion of the delivery of the articles to be brought with the borrowed money, a matter later considered, infra, in the Thomas appeal. In the instant twelve false applications, they were passed on to the Administrator, who accepted them for insurance. Subsequently some of these borrowers defaulted and the money lender collected its insurance from the FHA.

■ In all these transactions there is no evidence that Wilkins made any personal profit out of his corporate managerial function. The jury properly could infer that he had no other purpose than to obtain more secured loans for the money lender through the false applications, with their declared purpose printed in the supplied forms to have granted "credit under the terms of Title I of the National Housing Act."

One of the money lender's arguments is that in certain cases, not described, the applications, though on their faces made to be submitted to the Administrator for insurance, may have been regarded by the San Francisco office as too weak for such submission. These loans, if any, were kept as ordinary uninsured loans, in which event, if any were false and were defaulted, Manager Wilkins had caused his company a loss. We see no merit in this contention. Assuming that certain of the applications did not make the passing on through to the Administrator contemplated by Wilkins, the jury properly could infer that they were falsely made for that purpose. What is here pertinent to the money lender's contention is that twelve false applications were so passed on from Wilkins. It is of interest, but not necessary to constitute the crime, that they finally were presented to the Administrator and insured by him.

■ Another contention is that Wilkins, as branch manager for procuring the applications in the Yakima area, did not himself present the false applications to the Administrator. This argument ignores the provision of the penal statute that it is the knowing "causing to be *made*" the false statement "for the purpose of influencing in any way the action of said Administration" which constitutes the crime, here conspired to be committed. Here the conspirators are shown to have caused to be made the false applications for such purpose.

■ The money lender casts its claims of error in various forms, but underlying all is the contention that Manager Wilkins in procuring the applications for loans to be insured by the FHA had no corporate power to commit such acts of bad faith with a criminal intent imputable to the corporate entity. It claims that the manager of the Yakima area branch of the money lender is too low in the corporate hierarchy to bind the company in "causing to be made" such false credit statement-applications for transmission to the Administrator on the forms supplied to the area manager for that purpose.

We do not agree. It is the function delegated to the corporate officer or agent which determines his power to engage the corporation in a criminal transaction. Manager Wilkins, pressed by his seniors to procure the statements, was the *sole* "authorized agent of the company" who was "exercising the authority conferred on him" to "cause to be made" the credit statement-applications in the Yakima area to be passed on for presentation to the Administrator. The delegation of powers to him to create such corporate criminal responsibility is that described by the Supreme Court in New York Central & H. R. Co. v. United States, 212 U.S. 481, 494, 495, 29 S.Ct. 304, 306, 53 L.Ed. 613, where it is stated, "In this case we are to consider the criminal responsibility of a corporation for an act done while an authorized

agent of the company is exercising the authority conferred upon him. It was admitted by the defendant at the trial that, at the time mentioned in the indictment, the general freight traffic manager and the assistant freight traffic manager were authorized to establish rates at which freight should be carried over the line of the New York Central & Hudson River Company * * *. Thus, the subject-matter of making and fixing rates was within the scope of the authority and employment of the agents of the company, whose acts in this connection are sought to be charged upon the company. Thus clothed with authority, the agents were bound to respect the regulation of interstate commerce enacted by Congress, requiring the filing and publication of rates and punishing departures therefrom. Applying the principle governing civil liability, we go only a step farther in holding that the act of the agent, while exercising the authority delegated to him to make rates for transportation, may be controlled, in the interest of public policy, by imputing his act to his employer and imposing penalties upon the corporation for which he is acting in the premises."

The money lender's brief admits that this is also the law in England as compactly stated by Mr. Justice Atkin in Mousell Bros. v. London and Northwestern Railway Co., [1917] 2 K.B. 836, 846, "When a penalty is imposed for the breach of the duty, it is reasonable to infer that the penalty is imposed for the default of a person by whom the duty would ordinarily be performed."

The company was held liable in that case for a false account to avoid payment of tolls made on its behalf by a manager whose duty it was "to fill up or direct the filling up of the consignment notes from its principals, the appellants." The case came before a Divisional Court of three judges, Lord Chief Justice Viscount Reading and Ridley, J., agreeing with Atkin, J.

Here the Manager Wilkins was not only the "person by whom the duty [of causing to be made the statements] would ordinarily be performed" in the Yakima area, he was the only person having that duty. He was the primary agent of the corporation to determine the "good faith" in which the statements were made, to be passed on to be presented to the Administrator.

The New York Central case concerned a crime which required no showing of a criminal intent. However, the principle it states has been accepted in the circuits as controlling in corporate crimes in which intent is an essential factor. In Zito v. United States, 7 Cir., 64 F.2d 772, 775, the salesmen of a corporation made it commit the crime of conspiracy to violate the National Prohibition Act, 27 U.S.C.A. § 1 et seq. So also in Mininsohn v. United States, 3 Cir., 101 F.2d 477, 478; Egan v. United States, 8 Cir., 137 F.2d 369, 377; Joplin Mercantile Co. v. United States, 8 Cir., 213 F. 926, 935, Ann.Cas.1916C, 470, in affirming convictions, the acts of various corporate agents within their delegated functions were held to have created criminal intent in their corporations.

We do not regard any of these cases distinguishable from the instant case because the corporate function criminally performed was vested in an agent of higher dignity than the salesmen in the Zito case or the manager of the Yakima area of the appellant corporation's business of money lending there.

■ Hence it follows that it was proper to exclude evidence that others of the money lender's agents of higher status in the corporate activities knew nothing of the Yakima area's manager's violations of the corporation's good faith or that his causing of the false statements was contrary to the instructions to use care in their preparation. Its assignments of error in this respect are without merit.

■ The money lender claims reversible error in the failure to re-read an instruction to the jury under the following circumstances: The case was submitted to the jury on Saturday afternoon at about 3 o'clock. The jury deliberated until approximately 11:40 p.m., discontinuing for an hour or two in the evening for the purpose of having dinner. At about 11:30 p. m. word was sent to the court that a juror desired to have an instruction re-read. At this time, however, some of the defendants and defense counsel were not present, and it was impossible for them to reach the Court House before 12 o'clock midnight. The court was uncertain as to his right to instruct the jury on Sunday, and accordingly told the jury that he would be unable to re-read the instruction until Monday. Thereafter, the court directed the bailiff to advise the jury that it was not necessary for it to continue its deliberations throughout the night or Sunday, but that it might if it so desired, retire to bed and await the giving of further instructions. The jury advised the bailiff that it

desired to engage in further deliberations immediately, it being likely that it would be able to arrive at a verdict by so doing. Counsel for the various defendants were advised by the court of the substance of this communication between the court and the jury. After approximately 40 minutes of deliberation, the jury advised the court that it had arrived at a verdict. All defendants and their counsel then being present, the court was formally convened, and the jury returned and delivered its verdict. The jury was then polled, at the request of defense counsel, and each juror declared that the verdict as announced was his verdict, as well as the verdict of the jury. The jury was thereupon discharged. No objection to the above proceedings, or to any part thereof, was made by any counsel in the case.

■ It is obvious that the money lender's counsel may be deemed to have thought it of no advantage to his client to have the instruction reread. We consider such claimed error, not excepted to, only "far enough to see that there has been no miscarriage of justice." Giles v. United States, 9 Cir., 144 F.2d 860, 861. No substantial harm is shown to have been suffered by the money lender.

■ The fact that the district court proposed to delay until Monday to reread the instruction did not coerce the jury to hurry its deliberations. United States v. Olweiss, 2 Cir., 138 F.2d 798, 800; Jordan v. Bondy, 72 App.D.C. 360, 114 F.2d 599. The rereading of an instruction is well within the court's discretion in conducting a trial. It is for the court to determine whether or not the indictment or the exhibits should be sent to the jury room. Little v. United States, 10 Cir., 73 F.2d 861, 96 A.L.R. 889. Likewise, the question of whether or not the jury may have a written copy of the instructions is for the court. Outlaw v. United States, 5 Cir., 81 F.2d 805, certiorari denied 298 U.S. 665, 56 S.Ct. 747, 80 L.Ed. 1389. The court may similarly determine, within its discretion, whether or not the jurors may visit the scene of the crime, or may have a transcript of any or all of the testimony in the case. Thus, in the case of United States v. Ginsburg, 7 Cir., 96 F.2d 882, certiorari denied 305 U.S. 620, 59 S.Ct. 81, 83 L.Ed. 396, the jury, after having been instructed, returned to the court room and requested that it be permitted to view a certain hallway and reception room which had been

the subject of testimony. In the alternative the jury requested a transcript of the testimony which had been given describing these premises. The jury stated that it believed it important to have this information in order to determine the factual issues in the case. The district court refused to grant these requests, stating, "You will have to depend on your recollections." 96 F.2d 886. The Circuit Court of Appeals for the Seventh Circuit held that there was no error and no basis for raising an objection.

There was no reversible error in advising the juror that he would have to wait until Monday to have an instruction reread.

■ It is also urged that because the money lender (as well as all the other defendants) had offered to waive its right of trial by jury and demanded a trial by the court, it was entitled to trial by the court alone. The government did not join in the waiver but opposed a trial by the court.

In Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854, 70 A.L.R. 263, the circuit court of appeals addressed to the Supreme Court the question whether, in a criminal case, the defendant and the United States could waive the constitutional right to a trial by twelve jurors. In answering the question in the affirmative, the Supreme Court, in concluding that such a waiver must be with the consent of the government, stated, "In affirming the power of the defendant in any criminal case to waive a trial by a constitutional jury and submit to trial by a jury of less than twelve persons, or by the court, we do not mean to hold that the waiver must be put into effect at all events. That perhaps sufficiently appears already. Trial by jury is the normal and, with occasional exceptions, the preferable mode of disposing of issues of fact in criminal cases above the grade of petty offenses. In such cases the value and appropriateness of jury trial have been established by long experience, and are not now to be denied. Not only must the right of the accused to a trial by a constitutional jury be jealously preserved, but the maintenance of the jury as a fact-finding body in criminal cases is of such importance and has such a place in our traditions, that, before any waiver can become effective, the consent of government counsel and the sanction of the court must be had in addition to the express and intelligent consent of the defendant. And the duty of the trial court in that regard is not to be discharged as a mere matter of rote, but with

sound and advised discretion, with an eye to avoid unreasonable or undue departures from that mode of trial or from any of the essential elements thereof, and with a caution increasing in degree as the offenses dealt with the increase in gravity." Patton v. United States, supra, 281 U.S. 312, 313, 50 S.Ct. 263, 74 L.Ed. 854, 70 A.L.R. 263.

The money lender claims that because the facts before the court in the Patton case included the consent of the United States to the waiver, the statement that such consent is necessary is mere dictum. That dictum, it claims, is overruled by the statement of the Supreme Court in the recent case of Adams v. United States, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268, 143 A.L.R. 435, of the value in certain cases to an accused layman without counsel of a trial by the court. The Adams case states, 317 U.S. 278, 63 S.Ct. 241, 87 L.Ed. 268, 143 A.L.R. 435, "* * * whether or not there is an intelligent, competent, self-protecting waiver of jury trial by an accused must depend upon the unique circumstances of each case. The less rigorous enforcement of the rules of evidence, the greater informality in trial procedure—these are not the only advantages that the absence of a jury may afford to a layman who prefers to make his own defense. In a variety of subtle ways trial by jury may be restrictive of a layman's opportunities to present his case as freely as he wishes. And since trial by jury confers burdens as well as benefits, an accused should be permitted to forego its privileges when his competent judgment counsels him that his interests are safer in the keeping of the judge than of the jury."

The claim is that the Constitution gives the United States no right to a trial by jury. The right is given the accused. He may not only refuse to exercise it but, it is claimed, he may demand a court trial which must be granted him, since otherwise he would not, in certain cases, secure the advantages for a layman described in the Adams case. The argument continues with the claim that a money lender corporation is likely to find a jury prejudiced against it because such a corporation and hence, on the same reasoning, if the right to a court trial exists in laymen without counsel it exists in a corporation though represented by counsel.

If the rule of the Patton case be dictum because the government had consented to the waiver, so also is the money lender's claimed interpretation of the Adams case.

There, also, the United States had joined in the waiver.

The Supreme Court in the Adams case summarizes its holding in the Patton case without suggestion that its statement of the law is in error. We do not agree that the later case thus sub silentio overrules the statement of the earlier that "the maintenance of the jury as a fact-finding body in criminal cases is of such importance and has such a place in our traditions, that, before any waiver can become effective, the consent of government counsel and the sanction of the court must be had, in addition to the express and intelligent consent of the defendant."

The rule so stated was the ground of the decision in recent years by several circuit courts of appeal. In United States v. Dubrin, 2 Cir., 93 F.2d 499, certiorari denied 303 U.S. 646, 58 S.Ct. 644, 82 L.Ed. 1107, the defendant waived a jury trial, but the prosecution refused to consent thereto. The trial court thereupon refused to try the case without a jury. The Circuit Court of Appeals for the Second Circuit, in an opinion by Judge Augustus N. Hand, held that this refusal did not constitute error in view of the "explicit announcement" in the Patton case to the effect that consent of the government is required (93 F.2d 505). Similarly, in the case of Rees v. United States, 4 Cir., 95 F.2d 784, the trial court refused to accept a waiver of jury trial because of the failure of the prosecution to consent thereto. The Fourth Circuit, citing the Patton case and the Dubrin case, held that this refusal was not error. See also Irvin v. Zerbst, 5 Cir., 97 F. 2d 257, certiorari denied 305 U.S. 597, 59 S.Ct. 97, 83 L.Ed. 379.

We hold there was no error in the refusal to try the money lender by the court without a jury, or other error warranting a reversal of the judgment.

### The appeal of Herm G. Link.

Appellant Link filed no brief here, but it was agreed at the hearing that a holding that there existed no conspiracy of which he was a part, would warrant a reversal of his judgment.

Upon what is said above his judgment and sentence should be affirmed.

### The appeal of P. A. Thomas.

The practice provided by the regulations to create the loans to be secured by the Administrator, starts with the supplying of certain forms by the money lender to the

dealer. The dealer gives to a prospective borrower a form of application described in the regulations on which the borrower states his credit status and the articles desired to be purchased by him, the cost of each, and the dealer from whom they are to be purchased. If there be more than one dealer, one of them advances the funds to purchase the articles to be contracted for by the other dealer or dealers.

When the articles contracted for are delivered to the borrower, he, on a form provided by the regulations, signs a receipt of their delivery. The dealer then signs a certificate, prescribed by the regulations and later considered, concerning the delivery to the borrower of the articles contracted for. The borrower than signs an installment promissory note payable to the dealer for a sufficient amount to cover the purchase price stated in the application and interest to the end of the installment period. The dealer then endorses the note to the money lender and delivers to it the four documents, for which the money lender pays the dealer the sums of money stated·in the application for the purchase of the goods.

It was a proper inference for the jury to make that Thomas & Price's twenty-five solicitors, under the pressure of the "pep talks", brought in a very large business in its many small and larger articles to be purchased by the borrowers. There also were small sums for paint, stain, lumber, etc., .to be used in improving the premises of the borrower. The figures given warrant an inference of FHA sales of $180,-000 a year. Such success was the objective of the Federal Housing Administration Act and the regulations.

It was manifestly entirely impracticable for the two members of the firm of contractors to manage the whole business and besides personally to inspect the many hundred annual deliveries of their goods and mass of detail of installation where that was contracted for. Their method of determination was through their delivery men, who were to bring back no receipt of the borrower for goods or installations *contracted for by Thomas & Price* until their deliveries and installations had been made.

 The crime charged against Thomas, stated supra in considering the money lender's appeal, was conspiracy to "cause to be made" an instrument "knowing the same to be false" and "for the purpose of influencing * * * the action of said Administration." Knowledge of falsity and a purpose, that is, intent to use the falsehood for such influence, is the essence of the crime. It is not sufficient to prove Thomas guilty to show that he signed a document with an untruthful statement which might tend to influence the Administration. The burden on the government is to prove his knowledge of its falsity and his criminal intent so to influence the Administrator's acceptance of the borrower's note. This proof may be by circumstantial evidence, but such facts must be proved.

The government's primary contention involving Thomas in the conspiracy was his signing of five certificates, required by the regulations, concerning the delivery of goods. It is claimed that he signed the certificates knowing their statements to be false.

The borrower Crone signed and gave to Thomas & Price his application, on the form of the regulations, for a loan to purchase certain goods. Appearing in the application is the following:

"I (we) certify that the entire proceeds of this loan *will be* expended on the above property as itemized below:

| Describe Accurately Improvements or Installation *Planned* | Estimated Cost | Name and Address of Contractor, Dealer, Etc. |
|---|---|---|
| H. C. Little Floor Furnace | $174.90 | Thomas & Price Co. |
| Partitions, Drainboards Bath & Sink & Plumbing & 15 yards Linoleum | 250.00 | Montgomery Ward & Co. & Thomas & Price |
| Seal & Paint inside house and Built Builtins | | Self, labor to be supplied |
| * * * Porch & Extend House out 8 ft. | 350.00 | by Purchaser |

WARNING: Misrepresentations of use of proceeds other than described above constitutes violation of Federal law" (Emphasis supplied.)

Thomas & Price delivered the furnace. Thomas, who relied upon his delivery man for its delivery, is not shown to have known that the linoleum was not delivered. Thomas frankly did not attempt to inquire regarding any articles that were in fact "contracted for" by Montgomery Ward Co., if any were, or by the "self" of the application, or regarding their delivery if contracted for. In all the other four transactions there was no other contractor named, the word "self" appearing in each of the contractor columns under Thomas & Price's name. All articles to be furnished by them were delivered.

Crone, the borrower, and the other four borrowers, signed the following receipt form required by the regulations:

"Borrower's Receipt for Merchandise

Notice to Borrower—DO NOT SIGN THIS CERTIFICATE UNTIL MATE-RIALS HAVE BEEN SATISFACTORILY DELIVERED.

I hereby acknowledge receipt in satisfactory condition of the materials listed in my application for a loan pursuant to the provisions of Title I of the National Housing Act as amended. Said materials shall be used to improve the premises of which the address is given below.

(Signature) x [signed] C C Crone
 x Box 1136 Selah
 (Address of Property
 Improved)"

November 18 1939
 (Date)

At this place in the five transactions, Thomas had to consider his signing of a certificate required by the regulations. After consulting with his attorney, he signed such certificates in the five transactions, as follows:

To sustain its burden of proof of its charge of known falsity in the statement "we hereby certify that all articles and materials *contracted for* have been furnished, that the signature(s) on the Note and Receipt for Merchandise are genuine, that the Receipt for Merchandise was signed after the articles and materials *contracted for* had been delivered," the government must prove (1) what, if any, articles and materials were "contracted for"; (2) that certain of these articles and materials, so shown to be contracted for, were not delivered and/or installed, and (3) that Thomas knew both that they were contracted for and were not delivered or installed.

Obviously, the phrase "articles and materials contracted for" does not refer to any contracted for in the borrower's application, for the application does not purport to be a contract with any material ment. It is a proposal for a loan and contemplates contracts of purchase which "will be" thereafter made. However, the three columns quoted above concerning the materials sought by the borrower well may have raised a doubt in a business man's mind as to whether they created a contract with Montgomery Ward Co., who did not sign the application, and as to whether the applicant could have a contract with the "self" who signed it.

Nor would it be certain to a layman that this phrase in the certificate means "all the materials mentioned in the application," for, if this had been intended, that plain language well could have been used. That, in effect, was stated in the borrower's receipt printed on the reverse side of Thomas' certificate. Under a familiar rule of interpretation, the marked difference in phraseology in the two documents, one

"November ... 1939

TO: C.I.T. CORPORATION:
 In consideration of your purchasing the note given by the debtor(s) whose signature(s) appears on the Borrower's Receipt on the reverse hereof, we hereby certify that all articles and materials *contracted for* have been furnished, that the signature(s) on the Note and Receipt for Merchandise are genuine, that the Receipt for Merchandise was signed after the articles and materials *contracted for* had been delivered, and that we did not and will not perform any part of the work involved in the installation and/or application of said articles and materials.

Dealer/Contractor/Applicator THOMAS & PRICE CO.
to whom the note is made ➡ (Signature) [signed] P. A. Thomas
must sign here (Name)
 Pres
 (Title)"

(Emphasis supplied.)

referring to the other, would require a consideration as to whether a different area is covered by each. In any event, the difference in phraseology would raise in the mind of a layman business man a reasonable doubt. The phraseology of all three instruments presented to a business layman rational doubts of interpretation, to resolve which, in the normal course of business, he would seek advice of his attorney.

██ Thomas was entitled to show his absence of criminal intent and that he acted on the advice of his attorney if to him, a layman, the instrument was of doubtful interpretation. In the case of Hersh v. United States, 9 Cir., 68 F.2d 799, 806, in reversing for the refusal of the trial court to instruct the jury "* * * I further instruct you, as to the defendant Hersh he did in whatever the evidence may show he did or did not do, if he followed the counsel and advice of his attorney, defendant Klein, in whatever he did or did not do, and if he did so in good faith and without any intent to defraud, * * *" this court held, "While it is true that the advice of an attorney is not of itself a defense to the crime of concealment of property, nevertheless, it is an element to be considered in determining the good faith of the defendant. In order that concealment of the property of a bankrupt may be punished as a crime, it must be 'knowingly and fraudulently' concealed (11 U.S.C.A. § 52 (b). Indeed, if he so acted without the advice of an attorney, he was entitled to an acquittal certainly with that advice he should have been acquitted. Any fact tending to show lack of intent to defraud by concealment is proper to be considered by the jury. * * *" Miller v. United States, 10 Cir., 120 F.2d 968, 970; Cochran v. United States, 157 U.S. 286, 298, 15 S.Ct. 628, 39 L.Ed. 704; Williamson v. United States, 207 U.S. 425, 453, 28 S.Ct. 163, 52 L.Ed. 278.

██ What the government proved was that Thomas & Price, and *nobody else,* "contracted for" articles and materials and that all they contracted for were delivered, save the 15 yards of linoleum to Crone. As to the linoleum, the government failed to prove that Thomas *knew* that it was not delivered. On the contrary, as to the delivery of the linoleum, he relied upon his delivery man, as stated above. We do not believe that such reliance, standing alone, is evidence of a criminal intent to violate the statute and regulations which sought to have business firms expand their op-

erations as widely as possible, here by $180,000 a year, to create employment in the manufacture of the thousand and more articles and materials they annually sold.

Thomas offered to prove that he took the borrower's application and receipt and the form of the contractor's receipt to be signed by him to his attorney, a Mr. Van Diest, for his advice as to their meaning. Mr. Van Diest advised him, in effect, that it was proper to sign the certificate if Thomas & Price had delivered the goods "contracted by" them and to be delivered to the borrowers. The court stated at once regarding this offer of proof, "* * * *I am holding that it* [the phrase 'the materials contracted for'] *is not ambiguous.* It is my opinion, and I am holding that, that if Mr. Van Diest advised Mr. Thomas to violate the statute of the United States, there just isn't anything ambiguous about it; there isn't any question about it. It says: 'The materials contracted for.' *It means contracted for in the application* * * *."* (Emphasis supplied.)

As seen, the application is not a contract at all. It is an application for a loan addressed "To C. I. T. Corporation." It does not become a contract until the C. I. T. Corporation accepts it—that is *after* Thomas has signed his certificate. By its terms it refers to articles not then contracted for but to articles then "planned" for and for which "the loan *will be* expended" thereafter.

To sustain the court's ruling the certificate would have to be changed from "we certify that all the articles and materials *contracted for* have been furnished," to read "we certify that all the articles and materials *planned* to be bought and for which *the loan will be expended* have been furnished."

Since we ourselves cannot see how the terms of the certificate, in the form of the regulations, may be so interpreted, it cannot be said that a layman must conclude that "there just isn't anything ambiguous about" the certificate's necessary interpretation in the form so altered.

The above ruling of the court was in the absence of the jury. However, it was certainly prejudicial to Thomas' defense, in instructing with reference to the government's burden to show his guilty intent, that the court said, "I further instruct you that it is no defense in a criminal case that what has been done has been upon the advice of a lawyer. The fact that a man

96

consulted a lawyer is not to be construed to imply a guilty intent upon his part. But *you* as *jurors* have the task of deciding whether what was done was a violation *of the law,* and, if it was in violation *of law,* whether it was done with *intent to violate the law.* In determining this question, you are not to consider or be influenced by the fact that a lawyer may have been consulted in the transaction. The consultation with a lawyer adds nothing to and detracts nothing from the problem which you have to decide. You should ignore it." (Emphasis supplied.)

 Later, on the motion for a new trial, the district court sought to sustain its refusal to admit the testimony on the further ground that, in addition to the documents offered for the attorney's consideration, Thomas should have disclosed "the background of the transaction, the facts concerning the prior use of completion certificates, the manner in which the transactions were handled, or to the FHA regulations. In order to make use of advice of counsel, full disclosure must be made, Shushan v. United States, 5 Cir., 117 F.2d 110, 118, 133 A.L.R. 1040; Williamson v. United States, 207 U.S. 425, 28 S.Ct. 163, 52 L.Ed. 278 * * *."

The *only background necessary fully to* present to his lawyer the question of the construction of the words of the documents and how the documents should be handled, is the Administrator's regulations for their use. These regulations are law, Rosen v. United States, 245 U.S. 467, 473, 38 S.Ct. 148, 62 L.Ed. 406, of which the lawyer was charged with knowledge. There was no need for Thomas to take the regulations to Mr. Van Diest to make such a full disclosure of his legal problem as to the meaning of the certificate.

The district court further stated on the motion for a new trial that it appeared that, even after securing the advice, Thomas showed doubt as to the meaning of the certificate he was to sign. Reading these documents over, such continued confusion seems to us likely, but it is not conclusive, if any, evidence of criminal intent. It was a matter for the consideration of the jury, in connection with all the other evidence, in determining whether the government had sustained its burden of proof of criminal intent in Thomas' mind when he gave his signed certificate to the money lender.

The government contends that there was other evidence upon which, if believed, the jury could have convicted Thomas. We cannot say that if the evidence concerning the advice of his lawyer had been admitted the jury would not have acquitted him. The refusal to admit it is reversible error.

The judgment and sentence as to P. A. Thomas are reversed.

The judgments and sentences as to the C. I. T. Corporation and as to Herm G. Link are affirmed.

HEALY, Circuit Judge (concurring in part and dissenting in part).

I think the judgments below should be affirmed.