**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Bruce Anthony COLLOM,
Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Stephen COLLOM, Defendant-Appellant.**

**Nos. 77–1040, 77–1034.**

United States Court of Appeals,
Ninth Circuit.

Nov. 23, 1979.

Rehearing Denied in No. 77–1040
March 5, 1980.

**626**

Rudolph A. Diaz (argued), Los Angeles, Cal., for defendants-appellants.

Darrell W. MacIntyre, Asst. Chief U. S. Atty. (argued), Los Angeles, Cal., for plaintiff-appellee.

Before CHOY and WALLACE, Circuit Judges, and TURRENTINE,* District Judge.

WALLACE, Circuit Judge:

Bruce Collom appeals his conviction for robbing a federally insured savings and loan association in violation of 18 U.S.C. § 2113(a). His brother Stephen Collom appeals his conviction for aiding and abetting

* Honorable Howard B. Turrentine, United States District Judge, Southern District of California, sitting by designation.

the robbery in violation of 18 U.S.C. § 2. We affirm both convictions.

## I.  The Facts

On September 30, 1976, at 11:30 a. m., Bruce Collom (Bruce) robbed the Garden Grove Federal Savings and Loan Association in Garden Grove, California. Complying with his demand for money, a teller put $3,439 in cash in a paper sack supplied by Bruce. Bruce then left the building, ran down an alley, and was seen leaving the area in a green Ford Mustang, license number 247 PON, being driven by another man.

About an hour later, Eileen Hedrick was walking by Parking Lot C on the UCLA campus, which is approximately 44 miles from the Garden Grove Federal Savings and Loan Association. From the sidewalk adjacent to the lot and moments later from the window of a nearby building, she saw Bruce and his brother Stephen Collom (Stephen), who matched the description of the driver of the getaway car, wiping the exterior of the green Mustang with rags. Suspecting a burglary, Hedrick telephoned the campus police.

Officer Malone of the UCLA Police Department received a radio call directing him to Parking Lot C to investigate a possible auto theft. Upon arriving at the lot, Malone saw Stephen and Bruce stooped down at the rear of the Mustang, license number 247 PON, with a rolled-up T-shirt between them. As Malone stopped his car about 20 feet from them, they stood up and began to walk away rapidly. Being aware of the high incidence of burglary and auto theft in this area, and suspecting criminal activity, he asked them to stop. They complied.

Officer Longo then arrived, and the officers questioned the two men separately about their purpose and the ownership of the Mustang. Bruce said that the car belonged to his friend Debbie and that he was borrowing some tools from it. Stephen claimed he was borrowing tools to fix his

own car, but he was unable to say where his own vehicle was located. Both men said they were on their way to register for school. Officer Malone noticed what appeared to be damage to the left rear window of the Mustang, to the ignition wires, and to the glove box.

Officer Stanley, who had arrived about the same time as Longo, asked and received Bruce's permission to examine the T-shirt. Inside she found several cans of wax, miscellaneous tools, sunglasses, and a toy pistol resembling a .38 caliber revolver. After Malone and Longo questioned the men, Longo was informed over his police radio that the Mustang belonged to a Mr. Jones.

At this point, Stephen and Bruce were placed under arrest and taken to the UCLA police station. No *Miranda* warnings were given. At the station, the two suspects were questioned further and searched. Stephen was discovered to have $402 in his wallet and pockets; Bruce had a total of $3,042 in his wallet, shirt pocket, and the sleeve of his jacket. Some of the bills found on Bruce were later identified as "bait money" which had been put in his bag at the savings and loan. Only after the arrest did the UCLA police learn that the robbery in Garden Grove had occurred.

Bruce was indicted by a federal grand jury for robbing the savings and loan association; Stephen was indicted for aiding and abetting the robbery. Both pleaded not guilty, and both moved to suppress all the evidence taken by the UCLA police officers. The district judge granted the motion with respect to statements made after arrest since no *Miranda* warnings had been given. In all other respects the motion was denied. The matter then went to trial, and the jury returned verdicts of guilty against both defendants.

On appeal, Stephen claims that the motion to suppress should have been granted in full, that certain evidence admitted at trial should have been excluded because the trial judge had previously found its probative value to be outweighed by its prejudicial effect, and that a mistrial should have been granted. Bruce admitted at trial that he had performed the robbery, but he claims on appeal that his conviction must be reversed because the trial court wrongfully refused to give a requested instruction relating to his insanity defense, because the trial court should have granted his motion for a continuance, and because he was inadequately represented by his attorney.[1] We now consider these issues.

## II. *The Motion to Suppress*

Prior to the adoption of the Federal Rules of Evidence, the law of this circuit required a federal court to judge the legality of a stop, arrest, or search and seizure by state officers under both state and federal standards, violation of either standard constituting sufficient grounds for suppression of the evidence. *United States v. Solomon*, 528 F.2d 88, 90 (9th Cir. 1975); *United States v. Lovenguth*, 514 F.2d 96, 98 (9th Cir. 1975); *United States v. Walling*, 486 F.2d 229, 235 (9th Cir. 1973), *cert. denied*, 415 U.S. 923, 94 S.Ct. 1427, 39 L.Ed.2d 479 (1974); *United States v. Fisch*, 474 F.2d 1071, 1075 (9th Cir.), *cert. denied*, 412 U.S. 921, 93 S.Ct. 2742, 37 L.Ed.2d 148 (1973); *Wartson v. United States*, 400 F.2d 25, 27 (9th Cir. 1968), *cert. denied*, 396 U.S. 892, 90 S.Ct. 184, 24 L.Ed.2d 166 (1969). The effect, if any, of the Federal Rules of Evidence on this rule is uncertain.[2] However,

---

1. In his brief, Bruce also incorporates by reference all the arguments raised by Stephen on appeal. It is unclear to us what he expects to gain by so doing. At trial, Bruce admitted that he robbed the bank, choosing to make the insanity argument the sole basis of his defense. Thus, even were we to suppress the evidence objected to by Stephen or grant Stephen his mistrial, it is not at all certain that Bruce's conviction would be affected. Since we reject Stephen's arguments, however, we need not decide how a contrary decision would have affected Bruce.

2. The admissibility of evidence in federal trials conducted after July 1, 1975, the effective date of the Federal Rules, see Pub.L.No.93–595, 88 Stat. 1926, is primarily governed by Rule 402, which provides:

    All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by

we need not reach this question, for we hold that under both federal and state standards, the motion to suppress was properly denied.

Stephen argues that the motion to suppress all the evidence—both oral and physical—taken by the UCLA police should have been granted in its entirety for three reasons: (1) the initial investigatory stop of Stephen and Bruce by Officer Malone was illegal; (2) *Miranda* warnings should have been given during that stop, even though an arrest had not been made; (3) the subsequent arrest was not based on probable cause. We find no merit in any of these contentions.

■■■ Our circuit has consistently held that an investigatory stop short of an arrest is valid if based upon a founded or reasonable suspicion that criminal activity is afoot. *E. g., United States v. Holland*, 510 F.2d 453, 455 (9th Cir.), *cert. denied*, 422 U.S. 1010, 95 S.Ct. 2634, 45 L.Ed.2d 674 (1975); *Gaines v. Craven*, 448 F.2d 1236 (9th Cir. 1971); *Wilson v. Porter*, 361 F.2d 412, 415 (9th Cir. 1966). The Supreme Court has recently defined reasonable suspicion to exist when the detaining officer is "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the law is being broken.[3] *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Similarly, California law permits investigatory stops when an officer has a "rational suspicion" that "some activity out of the ordinary is or has taken place," that the subject under scrutiny is connected with the unusual activity, and that "the unusual activity is related to crime." *People v. Henze*, 253 Cal.App.2d 986, 988, 61 Cal.Rptr. 545, 547 (1967); *see, e.g., People v. Wheeler*, 43 Cal.App.3d 898, 902–03, 118 Cal.Rptr. 205, 207 (1974). *See also, United States v. Orozco*, 590 F.2d 789, 792 (9th Cir. 1979).

■■■ We have no difficulty deciding that the investigatory stop conducted by Officers Malone, Longo and Stanley was appropriate under both federal and state standards. The radio bulletin directed them to investigate a possible burglary of an automobile in an area plagued by such incidents. Stephen and Bruce were found stooping down suspiciously at the rear of the green Mustang. Upon seeing Officer Malone, they began to retreat rapidly. The totality of these circumstances easily justified the officer in stopping them and asking them questions.

■■■ Stephen asserts that even though an arrest had not been made at this point, his statements to the officers should have been suppressed because *Miranda* warnings were not given. We disagree. We have held on numerous occasions that even though one's freedom of action is inhibited to some degree during an investigatory detention, *Miranda* warnings need not be given prior to questioning in that circumstance. *E. g., United States v. Hickman*, 523 F.2d 323, 326–27 (9th Cir. 1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 778, 46 L.Ed.2d 639 (1976); *United States v. Edwards*, 444 F.2d 122, 123 (9th Cir. 1971); *United States v. Smith*, 441 F.2d 539–40 (9th Cir. 1971); *United States v. Chase*, 414 F.2d 780, 781–82 (9th Cir.), *cert. denied*, 396 U.S. 920, 90 S.Ct. 247, 24 L.Ed.2d 200 (1969); *Lowe v. United States*, 407 F.2d 1391, 1393–94 (9th Cir. 1969). California courts applying California law have reached the same conclusion. *People v. Hill*, 12 Cal.3d 731, 767, 117 Cal.Rptr. 393, 420, 528 P.2d 1, 28 (1974); *see, e.g., People v. Manis*, 268 Cal.App.2d 653, 661–69, 74 Cal.Rptr. 423, 428–33 (1969); *People v.*

these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

**3.** In dealing with the investigatory-stop issue, we have spoken in terms of a "founded suspicion" while the Supreme Court has referred to a "reasonable suspicion." *United States v. Brignoni-Ponce, supra*, 422 U.S. at 882, 95 S.Ct.

2574. As we have explained elsewhere, however, "there is no substantial difference between the doctrine of 'founded suspicion' used by this court, and the 'reasonable suspicion' test announced in *Brignoni-Ponce.*" *United States v. Rocha-Lopez*, 527 F.2d 476, 477 (9th Cir. 1975), *cert. denied*, 425 U.S. 977, 96 S.Ct. 2181, 48 L.Ed.2d 802 (1976).

*Wheeler, supra*, 43 Cal.App.3d at 903, 118 Cal.Rptr. at 207.

■ Stephen claims that Officer Stanley's action in unrolling the T-shirt was illegal because it went beyond the scope of searches permitted during investigatory stops. It is apparent from the record, however, that Bruce consented to that limited search, and we do not understand either Bruce or Stephen to argue that the consent was involuntary. Thus, there are no grounds for concluding under federal law that the T-shirt and its contents were not legally examined. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222–46, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Davis v. United States*, 328 U.S. 582, 587–94, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946); *Zap v. United States*, 328 U.S. 624, 628, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946). The result is the same under California law. *E.g., People v. James*, 19 Cal.3d 99, 106–07, 137 Cal.Rptr. 447, 450–51, 561 P.2d 1135, 1138–39 (1977); *People v. Ruster*, 16 Cal.3d 690, 699–701, 129 Cal.Rptr. 153, 158–59, 548 P.2d 353, 358–59 (1976); *People v. Strawder*, 34 Cal. App.3d 370, 376–81, 108 Cal.Rptr. 901, 904–07 (1973).

■ We also reject Stephen's assertion that the officers lacked probable cause to arrest him. This is a classic case of founded suspicion ripening into probable cause to arrest. *See United States v. Thompson*, 558 F.2d 522, 524 (9th Cir. 1977), *cert. denied*, 435 U.S. 914, 98 S.Ct. 1466, 55 L.Ed.2d 504 (1978); *United States v. Avalos-Ochoa*, 557 F.2d 1299, 1303 (9th Cir.), *cert. denied*, 434 U.S. 974, 98 S.Ct. 532, 54 L.Ed.2d 466 (1977). After the initial stop, Officer Malone observed extensive damage to the Mustang such as that which results when someone attempts to steal or burglarize an automobile. The brothers' explanation of their activities around the car and their identification of its owner were extremely dubious. Once the officers gained this additional information, probable cause to arrest existed. "[A]t that moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [the two men] had committed or [were] committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). California law is similar: "Cause for arrest exists when the facts known to the arresting officer 'would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime.'" *People v. DeVaughn*, 18 Cal.3d 889, 895, 135 Cal.Rptr. 786, 789, 558 P.2d 872, 875 (1977) (quoting *People v. Harris*, 15 Cal.3d 384, 389, 124 Cal.Rptr. 536, 539, 540 P.2d 632, 635 (1975)); *e.g., People v. Gomez*, 63 Cal. App.3d 328, 333–34, 133 Cal.Rptr. 731, 733–34 (1976); *People v. Knutson*, 60 Cal.App.3d 856, 861–63, 131 Cal.Rptr. 846, 849–50 (1976); *see* Cal. Penal Code § 836(3) (West 1970). Thus, the same result would obtain when the state standard is applied.

Since the arrest was proper, the search which disclosed the stolen money was obviously legitimate under federal standards as incident to a lawful arrest. *See United States v. Edwards*, 415 U.S. 800, 802–03, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1973); *Chimel v. California*, 395 U.S. 752, 755–68, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Carroll v. United States*, 267 U.S. 132, 158–59, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The same result follows under California law. *People v. Ross*, 67 Cal.2d 64, 69–71, 60 Cal.Rptr. 254, 258–60, 429 P.2d 606, 610–12 (1967), *rev'd on other grounds sub nom. Ross v. California*, 391 U.S. 470, 88 S.Ct. 1850, 20 L.Ed.2d 750 (1968); *People v. Balassy*, 30 Cal.App.3d 614, 622–23, 106 Cal.Rptr. 461, 465–66 (1973); *People v. Rogers*, 241 Cal.App.2d 384, 388–90, 50 Cal.Rptr. 559, 561–62 (1966); *see* Cal. Penal Code § 1412 (West 1970).

We conclude, then, that the district judge's ruling on the motion to suppress was correct. Except for the failure to give *Miranda* warnings after his arrest, Stephen's rights were not violated when the officers stopped and questioned him, or when they arrested and searched him. Thus, only the post-arrest statements, which the judge did suppress, were subject to exclusion.

## III. The Exclusion of Evidence as More Prejudicial Than Probative

■ During the trial, Officer Longo related several statements made to him by Stephen during the investigatory stop, namely that he was borrowing tools from the Mustang which belonged to a friend in order to repair his own car, that he could not give the exact location of his own car, and that he was going to enroll as an extension student at UCLA. Although the trial judge had properly refused to suppress these statements as illegally obtained, Stephen's counsel again sought to block their admission by a timely objection and assertion that the testimony was irrelevant.[4] A sidebar conference followed in which Stephen claims the district judge finally ruled that the statements were inadmissible under Federal Rule of Evidence 403[5] as being more prejudicial than probative. The government disputes this. Thus, we are not asked to decide whether the ruling was correct, but to determine just what the ruling was.

During the sidebar conference, the prosecutor made an offer of proof and each side explained its position.[6] The judge then said, "I think [the prosecutor] is right, it shows that they are trying to disengage themselves from the getaway car." When defense counsel protested further that the testimony was cumulative and prejudicial, the judge responded, "I think it is prejudicial, and I think its probative value is outweighed by whatever prejudicial effect it might have."

No more was said on the subject at the sidebar conference, and after an unrelated matter was discussed, the prosecutor continued his examination of Officer Longo by asking almost immediately, "What did you say to him, Mr. Stephen Collom, and what did he say to you in this conversation?" Officer Longo then related the substance of their conversation. There was no objection or motion to strike, and the matter was apparently not raised again until this appeal.

We are thus faced with a confusing record. Stephen claims that the judge meant to sustain his objection, as evidenced by the judge's last remark on the subject. The government, however, argues that the judge intended to admit the testimony in accordance with his statement that "[the prosecutor] is right."

For several reasons we are convinced that the trial judge intended to overrule the objection. First, although the judge's back-to-back, flatly contradictory statements were puzzling, neither the prosecutor, who appeared to have won the point until the judge's final comment, nor defense counsel sought clarification. It thus seems likely that the judge inadvertently said the reverse of what he meant, and that the lawyers understood his true intent from his entire statement. Second, immediately after the sidebar conference the prosecutor openly asked the very question to which Stephen's counsel claims the judge had sustained his objection. Yet, neither the judge nor Stephen's counsel said anything. One would fully expect one of the two to speak up had the prosecutor blatantly ignored a ruling made just seconds earlier. Third, a few moments prior to this incident the judge had permitted, over objection, Officer Malone to relate his conversation with

4. He also objected on the grounds that *Miranda* warnings should have preceded this questioning. As we have said, however, the trial judge had already correctly decided this issue against Stephen at the pretrial hearing on the motion to suppress.

5. Rule 403 provides:
   Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

6. Counsel for Stephen argued that the testimony was relevant only to show that Stephen may have stolen the car, a crime for which he was not then on trial, and that putting this evidence before the jury was "prejudicial on a side issue." The prosecutor responded that the testimony was highly relevant as proof that Stephen was trying to explain away his connection with the getaway car, thus implicating him in the robbery.

Bruce during the investigatory stop. It seems probable that he therefore intended to admit the analogous statements by Stephen to Officer Longo.

We conclude that the judge simply misstated his decision to overrule the objection, and that the attorneys so understood at the time. That decision, as we now interpret it, was clearly correct for the very reasons initially stated by the judge.

### IV. The Motion for Mistrial

After the jury had been instructed, Stephen's attorney moved for a mistrial based on three alleged errors by the district judge: (1) the failure to answer a question from the jury; (2) the prejudicial withdrawal of an instruction previously given to the jury; (3) the failure, once the instruction was withdrawn, adequately to present Stephen's theory of the case in the remainder of the instructions.

Shortly after the case had been submitted to the jury, a written question was sent from the jury to the judge asking, "Is aiding and abetting after the fact constitute a violation of the law?" [sic]. In response, the judge reinstructed the jury on the elements of aiding and abetting, and he specifically invited them to ask further questions should the need arise. Stephen argues that this was not adequately responsive to the question and that a mistrial was the appropriate remedy.

■■ "The necessity, extent and character of additional instructions are matters within the sound discretion of the trial court." *Wilson v. United States*, 422 F.2d 1303, 1304 (9th Cir. 1970). *Accord, United States v. Beasley*, 476 F.2d 164, 166 (9th Cir.), *cert. denied*, 414 U.S. 839, 94 S.Ct. 92, 38 L.Ed.2d 76 (1973); *Allen v. United States*, 186 F.2d 439, 444 (9th Cir.), *cert. denied*, 341 U.S. 948, 71 S.Ct. 1015, 95 L.Ed. 1372 (1951); *C.I.T. Corp. v. United States*, 150 F.2d 85, 91 (9th Cir. 1945). The district judge acted well within his discretion in this case. The meaning the jury attached to the words "after the fact" in the question is unclear since there had been no "accessory after the fact" charge or other instruction

using that phrase. While the judge was free to do so, attempting to respond to the question directly would have risked further confusion. The judge therefore acted appropriately in merely rereading the previously given aiding and abetting instructions and inviting further questions should the confusion persist. The mistrial motion was properly denied insofar as it relied on this incident.

The remaining two arguments in support of the mistrial motion stem from the withdrawal from the jury of an instruction previously given. When he had concluded his charge to the jury, the judge asked the attorneys out of the hearing of the jury if they had any objections or further requests. At this late time, Stephen's attorney asked the judge to instruct the jury that "the circumstances of [Bruce's] sanity may be taken into account in determining whether or not Stephen Collom is guilty of aiding and abetting." Over the prosecutor's objection, the following instruction was added to the charge already given:

> In determining the guilt or innocence of Stephen Collom you may consider the mental condition of his brother, Bruce Anthony Collom, at the time of the commission of the offense.

The jury, not surprisingly, was confused by the instruction and asked the judge about it after the case had been submitted to them. On reconsideration, the judge decided that the instruction had been improvidently given and, over defense counsel's objection, he told the jury to disregard it. At the same time, he reminded them that the remainder of the charge was still in effect, and he reread his previous instructions concerning the elements of each offense, the government's burden of proof, the defendants' presumption of innocence, and the rule that mere presence at the scene of a crime does not establish aiding and abetting. He also offered to reread any other instruction the jury might desire. In response to his question, the jury assured the court that they would completely disregard the withdrawn instruction.

Stephen claims prejudice from this incident in two related arguments. First, he claims that the withdrawal of one instruction and subsequent rereading of other instructions unfairly emphasized the points in the case favorable to the government. Second, he asserts that once the instruction had been withdrawn, a legitimate theory of defense was no longer covered by the instructions as a whole, and that the jury would believe they must disregard the possible effect of Bruce's insanity on Stephen's opportunity to form a criminal intent.

▬ The trial judge was unquestionably correct when he decided that the instruction was improperly before the jury. At best it was highly confusing and failed to convey accurately the intended theory of defense; at worst it incorrectly suggested that Bruce's insanity could negate Stephen's criminal intent. "Where the court has given an erroneous instruction, it may be withdrawn or explained by the court so as to remove error which otherwise might be present. But the withdrawal must leave no doubt in the minds of the jury as to what the court ultimately declares the law to be." *Chicago, B. & Q. R. Co. v. Kelley*, 74 F.2d 80, 84–85 (8th Cir. 1934). *Accord, Seaboard Air Line R. Co. v. Bailey*, 190 F.2d 812, 815 (5th Cir. 1951); *Hansen v. St. Joseph Fuel Oil & Mfg. Co.*, 181 F.2d 880, 885 (8th Cir.), *cert. denied*, 340 U.S. 865, 71 S.Ct. 89, 95 L.Ed. 633 (1950). *Cf. United States v. Sharpe*, 452 F.2d 1117, 1119 (1st Cir. 1971) (no prejudice to defendant where court immediately withdrew erroneous instruction in emphatic terms). The district judge met this standard in this case. Only a single, brief instruction was involved, and the jurors explicitly agreed to "handle [their] deliberations as though that last instruction was never given." The remaining instructions were clear and consistent, and the judge wisely sought to blunt the focus necessarily given to the stricken sentence by reading several other of his basic instructions. These included points favorable to Stephen, specifically the principles that the defendant is presumed to be innocent, that the government bears the burden of proof, and that mere presence at the scene of the crime is not aiding and abetting. The need to withdraw a jury instruction is, of course, always an unfortunate incident in a criminal trial. But we think it was done here so as to minimize the possibility of substantial prejudice to the accused.

▬ With respect to Stephen's complaint that his theory of defense was excluded, he correctly argues that a defendant is entitled to jury instructions on a legitimate theory of defense if there is evidence before the jury to support it. *United States v. Noah*, 475 F.2d 688, 697 (9th Cir.), *cert. denied*, 414 U.S. 821, 1095, 94 S.Ct. 119, 38 L.Ed.2d 54 (1973); *Charron v. United States*, 412 F.2d 657, 660 (9th Cir. 1969); *Perkins v. United States*, 315 F.2d 120, 124 (9th Cir.), *cert. denied*, 375 U.S. 916, 84 S.Ct. 201, 11 L.Ed.2d 155 (1963). It is equally true, however, that "a defendant has no right to have a jury instructed precisely in the language he requests." *Charron v. United States, supra*, 412 F.2d at 660. As long as the theory is adequately presented by the instructions as a whole, there is no error. *See United States v. Pallan*, 571 F.2d 497, 501 (9th Cir. 1978).

Stephen's novel theory about the effect of his brother's sanity on his own criminal intent was adequately covered by the other instructions. The jury was carefully instructed on the requirements for criminal intent, and they were told that one's mere presence at the scene of the crime does not constitute aiding and abetting. In his closing argument, Stephen's attorney himself argued his theory in terms of the "mere presence" instruction. To the extent his theory was legally acceptable, the jury was adequately instructed and the charge they ultimately received permitted them to accept it.

## V. *The Insanity Instructions*

Bruce admitted that he committed the robbery, choosing to defend himself solely on the ground that he was legally insane when the event occurred. The district judge gave the insanity instruction announced by this court in *Wade v. United*

*States,* 426 F.2d 64, 71–72 (9th Cir. 1970) (en banc), supplemented with an instruction explaining the meaning of "wrongfulness" as used in *Wade. See United States v. Sullivan,* 544 F.2d 1052, 1055 (9th Cir. 1976); *United States v. McGraw,* 515 F.2d 758, 759–60 (9th Cir. 1975). The relevant part of the charge, with the explanation of wrongfulness emphasized, was as follows:

> In determining the issue of sanity I further instruct you that a person is considered legally insane, and therefore not responsible for criminal conduct, if at the time of such conduct, as a result of mental disease or defect, he lacks substantial capacity either to appreciate the moral wrongfulness of his conduct, or to conform his conduct to the requirements of the law.
>
> . . . . .
>
> *Now, for the purposes of the insanity defense, wrongfulness means moral wrongfulness rather than criminal wrongfulness.*

(Emphasis added).

Bruce does not object to these instructions, but he claims that reversible error occurred when the judge failed to include an additional instruction discussed in *United States v. Sullivan, supra,* 544 F.2d at 1055:

> You are instructed that the defendant lacked substantial capacity to appreciate the wrongfulness of his conduct, even if he knows his act to be criminal, but commits it because of a delusion that it was morally justified.

The district court rejected this instruction, saying that there had been no evidence that Bruce had acted under a delusion when he had robbed the bank and that the instruction was therefore not proper. On appeal, Bruce vigorously contends that the jury was presented with evidence of delusional behavior by Bruce, giving him the right to the requested instruction. We need not consider whether there was evidence of delusion before the jury. The instruction given was sufficient even if such evidence was presented.

Bruce insists on a specific instruction which was approved for fact situations similar to those in *Sullivan,* but he misconstrues the holding of that case. There we stated that it must be made clear to a jury considering an insanity defense that "wrongfulness" means moral, as opposed to criminal, wrongfulness. Bruce overlooks that in *Sullivan* we concluded that either one of two instructions would have been sufficient to meet the *Wade* standard in that case. 544 F.2d at 1055–56. Bruce complains because one of these instructions was not given here; in fact, as can be seen in the portion of the jury charge emphasized in the text above,' the district judge gave the alternative approved instruction. We see no reason to disapprove its use here or to require more.

Bruce appears to argue that "a delusion that [a criminal act] is morally justified" is somehow distinct from lacking "substantial capacity . . . to appreciate the moral wrongfulness of [one's] conduct." Thus, if there is evidence of such delusions, he would insist that a delusion instruction must be given in addition to the standard *Wade* statement. But in *Wade* we expressly pointed out that a delusion that a crime was morally justified was covered by the insanity instruction we there adopted. 426 F.2d at 71–72. Likewise, we explained in *Sullivan* that our use in a prior case of the word "delusion" has added no additional element to the concept of insanity encompassed in the *Wade* instruction. 544 F.2d at 1055 & n.1.

## VI. *Remaining Issues*

Bruce raises two final issues: (1) that the district judge erred in failing to grant him a continuance just before trial, and (2) that he was inadequately represented by counsel.

On November 23, 1976, the day trial was to begin, Bruce's attorney moved for a continuance claiming that his client's mental condition had prevented them from communicating effectively, and that more preparation time was needed. The motion was denied. After the jury was empaneled that day, however, the judge did recess the case for a full seven days.

■ Although a motion for a continuance was denied, Bruce nevertheless received an additional week to prepare for trial. We think it borders on the frivolous to complain of the denial. In any event, "[i]t is axiomatic that the granting of a continuance lies within the sound discretion of the trial judge and will be reversed only upon a showing of a clear abuse of discretion." *United States v. Michelson*, 559 F.2d 567, 572 (9th Cir. 1977). *Accord, Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); *United States v. Lustig*, 555 F.2d 737, 744–45 (9th Cir. 1977), *cert. denied* 434 U.S. 1045, 98 S.Ct. 889, 54 L.Ed.2d 795 (1978); *McConney v. United States*, 421 F.2d 248, 250 (9th Cir. 1969), *cert. denied*, 400 U.S. 821, 91 S.Ct. 39, 27 L.Ed.2d 49 (1970). We find no abuse of discretion here.

■ Our court is currently considering en banc what constitutes adequate assistance of counsel. *Cooper v. Fitzharris*, 551 F.2d 1162, *rehearing en banc granted*, No. 74–2998 (9th Cir. June 28, 1977). Even without the guidance that case may ultimately provide, however, we have no difficulty concluding that Bruce was adequately represented in this case under any of the relevant tests proposed.[7] Bruce complains of his attorney's failure to obtain certain information about his history of mental illness. He overlooks the fact that a great deal of such evidence was effectively put before the jury, including the testimony of two personal friends, a vocational counselor, and a psychiatrist who had interviewed Bruce and collected information on his history. In addition, the jury was shown an 80-minute video tape of Bruce being interviewed by a clinical psychologist. Perhaps

more background material could have been gathered, but we are convinced from the record that Bruce did not suffer from inadequate representation.

The convictions of both Bruce Collom and Stephen Collom are affirmed.

---

7. The various proposed standards for constitutionally acceptable assistance of counsel have been formulated in the following ways:

(1) whether counsel's performance was "so poor and incompetent as to make the trial a farce or mockery of justice"; (2) "whether the circumstances show a denial of fundamental fairness"; and (3) whether there was a "lack of effective aid in the preparation and trial of the case—lack of counsel likely to render reasonably effective assistance."

*United States v. Lemon*, 550 F.2d 467, 473 (9th Cir. 1977), *quoting de Kaplany v. Enomoto*, 540

F.2d 975, 987 (9th Cir. 1976) (en banc), *cert. denied*, 429 U.S. 1075, 97 S.Ct. 815, 50 L.Ed.2d 793 (1977).

Subsequent to June 15, 1978, the date we originally filed our decision in this case, we decided *Cooper v. Fitzharris*, 586 F.2d 1325 (9th Cir. 1978) (en banc). As Collom's claim of ineffective assistance of counsel is meritless under any standard, *Cooper* does not assist him. Indeed, it is apparent that Collom did not suffer the prejudice required by *Cooper*.