UNITED STATES of America,
Plaintiff-Appellee,

v.

Louis CORONA, III, etc.,
Defendant-Appellant.

No. 81–1201.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 10, 1981.

Decided Nov. 19, 1981.

Irwin H. Schwartz, Federal Public Defender, Dan R. Dubitzky, Asst. Federal Public Defender, Seattle, Wash., for defendant-appellant.

Curtis J. Frush, Asst. U. S. Atty., Seattle, Wash., for plaintiff-appellee.

Before SNEED and CANBY, Circuit Judges and HOFFMAN,* District Judge.

CANBY, Circuit Judge.

Corona was convicted of possessing an unregistered firearm in violation of 26 U.S.C. §§ 5861(d) and 5871. He contends that the district court erred in not suppressing the sawed-off shotgun found on his person during a pat-down search. We agree that the stop and search were not based upon a founded suspicion that Corona was about to commit or had committed a crime and that he was armed and presently dangerous, and that the findings of the district court to the contrary were clearly erroneous. We accordingly reverse.

_____
* The Honorable Walter E. Hoffman, Senior District Judge, for the Eastern District of Virginia, sitting by designation.

## FACTS

The evidence, viewed in the light most favorable to the government, *see United States v. Henry,* 615 F.2d 1223, 1230 (9th Cir. 1980), established the following facts. At about 11:45 p. m. on the night of November 14, 1980, Deputy Sheriff Wolfe, on patrol, observed Corona wearing a hat and long coat, standing near a closed garage at 224th Street and State Route 161, near Graham, Washington. The weather was cold and it was raining lightly. Across the street from Corona was a closed grocery store in which workers were stocking shelves. Deputy Wolfe knew that thefts from vehicles had occurred in the area recently.

Wolfe drove on by and spent the next 15 minutes at the Graham fire station. At about midnight he returned to the intersection where he had seen Corona and proceeded west on 224th Street. About a quarter to a half mile down the road, Wolfe found Corona hitchhiking (which was not unlawful) and gave him a ride because of the rain and light traffic. Because the front seat was filled with equipment, Corona got in the back seat behind Wolfe, where Wolfe was unable to observe him in the rear view mirror. Asked where he was going, Corona stated that he could not give the address but thought he could point the way. He said he had arrived in the area about ten days previously and was staying with a friend while he sought work as a shipwright.

As they reached 70th Avenue, Corona asked Wolfe to turn left. They then proceeded into a broadly defined area—from 224th to 260th Street along 70th Avenue—where Wolfe knew that nine or ten thefts from automobiles had occurred in the last ten days. Corona asked Wolfe to turn west at 246th Street. Wolfe knew that at that corner a revolver had been stolen from a police officer's truck about four days previously. Wolfe also knew that 246th Street was paved for only one and one-half blocks,

and then ended in a turn into a gravel roadway. Wolfe asked Corona which house he wanted, but Corona was not sure. He said he thought he could find it and would get out.

Wolfe let Corona out of the car and asked Corona for his identification. Corona answered that he had none with him because he had left his wallet at his friend's house. Wolfe then asked Corona to put his hands on top of the car and he patted Corona down. He felt a hard object and asked Corona what it was. Corona answered that it was his "protection" and Wolfe then reached inside the coat and removed a loaded, sawed-off shotgun. He also found three shells in Corona's pocket.

## THE STOP

█ In order to conduct a pat-down search, a police officer must be entitled to stop the person to be searched. *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). Even if it be assumed that the stop did not occur until Corona was told to put his hands on the car [1], the circumstances known to Wolfe, taken in their totality, did not furnish the articulable facts required as a basis for a founded suspicion that Corona had committed or was about to commit a crime. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975); *United States v. Rocha-Lopez*, 527 F.2d 476, 477 (9th Cir. 1975), *cert. denied*, 425 U.S. 977, 96 S.Ct. 2181, 48 L.Ed.2d 802 (1976); *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). While it may have been unusual for Corona to be standing where he was, and for him to be uncertain of the exact location of his destination, and to be without identification, those facts do not indicate a crime committed or about to be committed. They

do not, for example, indicate criminal activity in the manner displayed in the two cases most relied upon by the government, *United States v. Orozco*, 590 F.2d 789 (9th Cir.), *cert. denied*, 442 U.S. 920, 99 S.Ct. 2845, 61 L.Ed.2d 288 (1979), and *United States v. Collom*, 614 F.2d 624 (9th Cir. 1979), *cert. denied*, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980). In *Orozco* the two persons stopped were seated in a car in a high-crime area and one of them, upon seeing the patrol car, got out and went to a nearby wall and appeared to drop an object over it. In *Collom*, police investigating a suspected car burglary found two persons stooping behind the rear of an automobile, and they walked away rapidly when the officers came upon the scene. No comparable behavior occurred in the present case, nor did Corona engage in the kind of repetitious "casing" behavior that was held to justify a stop in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

On the contrary, we believe that the present case is closer to *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), where officers stopped two persons observed to be walking away from each other in an area known for a high incidence of drug traffic. The Supreme Court held the stop to be a violation of the Fourth Amendment, noting that the activity of the persons stopped furnished no objective basis for a reasonable suspicion that they were engaged in criminal conduct. We similarly conclude that the stop was unlawful in the present case.

## THE SEARCH

█ In order to justify the search, it was necessary for Wolfe to have a founded suspicion, based upon articulable facts, that Corona was armed and presently dangerous.[2] *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct.

---

1. Because we conclude that there was no founded suspicion for a stop or search at the time of the pat-down, it is not necessary for us to consider the question whether a stop may have occurred earlier, at the time that Deputy Wolfe requested Corona's identification.

2. In its conclusions, the district court stated that the pat-down was constitutional because it was only after the pat-down revealed a hard object that a further intrusion was made by reaching inside Corona's coat. The pat-down may not be initiated, however, in the absence

1868, 1883, 20 L.Ed.2d 889 (1968). Again, we find nothing in the facts known to Wolfe upon which to base such a belief. The mere circumstance that Corona was wearing a long coat on a rainy night, even when taken together with the other facts, does not suffice. This is not a case where the coat was unsuited to the weather, *see United States v. Bull*, 565 F.2d 869 (4th Cir. 1977), *cert. denied*, 435 U.S. 946, 98 S.Ct. 1531, 55 L.Ed.2d 545 (1978), or where it was not only unsuited but contained a suspicious and conspicuous bulge, see *United States v. Mireles*, 583 F.2d 1115 (10th Cir.), *cert. denied*, 439 U.S. 936, 99 S.Ct. 332, 58 L.Ed.2d 332 (1978). The situation here is far more analogous to *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), in which a pat-down search was held unlawful when the person searched was wearing a coat appropriate to the weather, was not recognized as a person with a criminal history, gave no indication that he carried a weapon, and made no threatening overtures. All of these circumstances are duplicated in the present case.

▮ We accordingly conclude that the stop and pat-down search of Corona were not based on the requisite founded suspicion, drawn from articulable facts, and that the district court's findings to be contrary were clearly erroneous.

REVERSED.

SNEED, Circuit Judge, dissenting.

This is an odd case and, no doubt for that reason, a difficult one to decide. The majority's conclusions insofar as they go are quite defensible and, were I more certain about the legitimacy of the exclusionary rule as generally applied, I perhaps would concur. But given my reservations, I must respectfully dissent.

We have been taught by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that "the central inquiry under the Fourth Amendment" is as to "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's

personal security." *Id.* at 19, 88 S.Ct. at 1878. To aid that inquiry certain verbal formulas have been developed which when applied in an even handed manner provide some consistency in the treatment of so-called "stop and search" cases. As to stops the majority repeats and applies the formula that a valid investigatory stop must rest upon "a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." *See Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979). As to pat-down searches the majority states and applies the standard that such searches are permissible where the officer "has reason to believe that he is dealing with an armed and dangerous individual." *Terry v. Ohio, supra*, 392 U.S. at 27, 88 S.Ct. at 1883.

Inevitably the specificity of these tests draws attention from the "central inquiry" appropriate to the application of the Fourth Amendment to a particular stop and pat-down search. So long as I frame the question this case presents in terms of the reasonableness of Officer Wolfe's stop and pat-down search I encounter little difficulty. Officer Wolfe did what a competent officer would do under the circumstances. His conduct was reasonable. He had reason to be apprehensive about the purpose of the appellant's actions and to be anxious about his own safety. The incidence of crime within the area, the vagueness of the appellant's directions, the out-of-the-way nature of the spot at which the appellant asked to be left, the hour of the night, and the absence of any identification justify the conclusion that the limited intrusion of the appellant's personal security resulting from Officer Wolfe's stop and pat-down search was reasonable.

Difficulties arise, I acknowledge, when the verbal formulas are invoked. What, the majority implicitly inquires, suggests that appellant was, or had been, or might become involved in criminal activity, or that he was armed and dangerous? Other than what has been mentioned there is nothing. This is not enough for the majority. For

---

of a founded suspicion that the subject is armed and presently dangerous. *Ybarra v. Illinois*,

444 U.S. 85, 92–93, 100 S.Ct. 338, 343, 62 L.Ed.2d 238 (1979).

me it is. I would hold that even under these formulas the evidence obtained by means of the stop and pat-down search is admissible. Alternatively, I would hold that the evidence is admissible because the stop and pat-down search was a reasonable intrusion of appellant's personal security.

Whatever lingering doubt that might otherwise haunt my mind takes flight when the purpose of the exclusionary rule is recalled. Despite some uncertainty caused at least in part by *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) it is now generally acknowledged that the rule was made by the courts and was designed to deter police behavior. *See* Schlesinger and Wilson, *Property, Privacy and Deterrence: The Exclusionary Rule in Search of a Rationale*, 18 Duquesne L.Rev. 225, 237 (1980). *But see* Sunderland, *Liberals, Conservatives, and the Exclusionary Rule*, 71 J.Crim. L. & C., 343, 375–77 (1980). This decision, however, will not deter officers who find themselves in a position similar to that in which Officer Wolfe found himself in this case. Nor should it. Officers so situated will not risk being slain on a back street because of this decision nor can I in good conscience ask them to assume such risks. The incidence of murdered policemen is too high to dismiss the risk lightly. The depth of my feeling can be evidenced by my affirmation that had I been Officer Wolfe I too would have stopped and conducted a pat-down search of the appellant.

To me, therefore, the fundamental issue this case presents comes down to this: Should the exclusionary rule be invoked when it, neither will, nor should, deter the officer from the intrusion in question. I think not. Thus, I respectfully dissent.