116 F.3d 364
 97 Cal. Daily Op. Serv. 3875, 97 Cal. Daily
Op. Serv. 5175,
97 Daily Journal D.A.R. 6561,
97 Daily Journal D.A.R. 8418
Charles E. McDOWELL, Petitioner-Appellant,
v.
Arthur CALDERON, Warden of the California State Prison at
San Quentin, Respondent-Appellee.
 No. 96-99000.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 21, 1996.
Decided Feb. 26, 1997.
Amended May 23, 1997.
Filed June 30, 1997.*
 
 Andrea G. Asaro, Rosen, Bien & Asaro, San Francisco, CA, for petitioner-appellant.
 Robert F. Katz, Deputy Attorney General, Los Angeles, CA, for respondent-appellee.
 Appeal from the United States District Court for the Central District of California; Mariana R. Pfaelzer, District Judge, Presiding. D.C. No. CV-90-04009-MRP.
 Before: WIGGINS, THOMPSON and TROTT, Circuit Judges.
 
 
 1
 Opinion by Judge DAVID R. THOMPSON; Partial Concurrence and Partial Dissent by Judge TROTT.
 
 
 2
 Prior Report: For Majority Opinion, see 107 F.3d 1351.ORDER
 
 
 3
 The opinion filed February 26, 1997 and published at 107 F.3d 1351 is amended by deleting Judge Trott as concurring in the majority opinion, and by adding to the majority opinion Judge Trott's concurring and dissenting opinion filed herewith.
 
 
 4
 With this amendment, Judges Wiggins and Thompson have voted to deny the petition for rehearing. Judge Thompson has voted to reject the suggestion for rehearing en banc, and Judge Wiggins recommends rejection. Judge Trott has voted to grant the petition for rehearing and to accept the suggestion for rehearing en banc.
 
 
 5
 The suggestion for rehearing en banc is being circulated to the entire court. An order accepting or rejecting that suggestion will be entered in due course.
 
 
 6
 TROTT, Circuit Judge, concurring and dissenting:
 
 
 7
 * In Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), the Supreme Court said that trial by jury is "fundamental to the American scheme of justice," id. at 149, 88 S.Ct. at 1447. In expanding on this statement, the Court observed that
 
 
 8
 The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it. Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power-a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges. Fear of unchecked power, so typical of our State and federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or innocence.
 
 
 9
 Id. at 155-156, 88 S.Ct. at 1450-51. A jury cannot fulfill this historic role in our Government, however, if it does not follow the law. It is not an unguided missile free according to its own muse to do whatever it wants. To accomplish its purpose as chartered in Duncan, a jury must be instructed properly as to the relevant law and as to its function in the fact-finding process. It also must follow these instructions. Otherwise, it too might exercise power in a manner thoroughly arbitrary, oppressive, or eccentric.
 
 
 10
 This demand is especially keen in a death penalty case where, as in California, the jury is the sentencer and decides whether a defendant shall live or die. The Supreme Court has made it abundantly clear, in a series of cases going back for almost twenty years, that for a jury determination of death to stand against Eighth Amendment scrutiny, the jury's discretion must be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Godfrey v. Georgia, 446 U.S. 420, 427, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980) (quoting Gregg v. Georgia, 428 U.S. 153, 189, 96 S.Ct. 2909, 2933, 49 L.Ed.2d 859 (opinion of Stewart, Powell and Stevens, JJ.) (1976)).
 
 
 11
 This means that if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates "standardless [sentencing] discretion." It must channel the sentencer's discretion by "clear and objective standards" that provide "specific and detailed guidance" and that "makes rationally reviewable the process for imposing a sentence of death." As was made clear in Gregg, a death penalty "system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in Furman [v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) ] could occur."
 
 
 12
 Godfrey, 446 U.S. at 428, 100 S.Ct. at 1764. (citation omitted). The Court reiterated this message in Walton v. Arizona, 497 U.S. 639, 653, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990), saying, "When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process."
 
 
 13
 On occasion, however, even though the instructions are flawless, jurors become confused and untracked. When they do, the risk is that any result reached by them, including a sentence of death, may not square with the law they are bound to apply. Accordingly, the unremarkable rule is that "[w]hen a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." Bollenbach v. United States, 326 U.S. 607, 612-13, 66 S.Ct. 402, 405-06, 90 L.Ed. 350 (1946). As the Seventh Circuit has said, Bollenbach places on the trial judge "a duty to respond to the jury's request with sufficient specificity to clarify the jury's problem." Davis v. Greer. 675 F.2d 141, 145 (1982). This duty exists among other reasons because " '[i]n a trial by jury ..., the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law.' " Bollenbach, 326 U.S. at 612, 66 S.Ct. at 405 (quoting Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 698, 77 L.Ed. 1321 (1933)). Moreover, when constitutional requirements are involved, the proper execution of this duty is a matter of insuring due process of law as guaranteed by the Fourteenth Amendment. Cf. Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (jury instruction violates Due Process Clause only if it affects some constitutional right).
 
 II
 
 14
 In the matter before us, we confront an evident case of serious jury mistake and confusion. As Judge Thompson correctly says, "[e]leven jurors were confused and mistakenly thought they could not consider the eight instances of McDowell's background as mitigating evidence."
 
 
 15
 Given the Eighth Amendment rules mandated by the Supreme Court in Furman, Gregg, and their offspring, to say that the jury's mistake and confusion is of great constitutional concern is an understatement. In order to reach in accord with these rules a principled life or death decision, a jury must consider the evidence put forward by a defendant in mitigation of his culpable behavior. Such consideration is a constitutional imperative. As a plurality of the Court said in Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978), five years before McDowell's trial:
 
 
 16
 There is no perfect procedure for deciding in which cases governmental authority should be used to impose death. But a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.
 
 
 17
 A majority of the Court repeated this message in Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), five months before the murder for which McDowell stands convicted. The issue in Eddings was not the constitutionality of a limiting statute as in Lockett, but of a sentencing trial judge's conclusion that he could not " 'in following the law' " " 'consider the fact of this man's violent background.' " Id. at 112-13, 102 S.Ct. at 875-76. The Court interpreted this statement to mean that "the trial judge did not evaluate the evidence in mitigation and find it wanting as a matter of fact; rather he found that as a matter of law he was unable even to consider the evidence." Id. at 113, 102 S.Ct. at 876 (emphasis in original). In reversing the judgment of death, the Court offered this reasoning:
 
 
 18
 Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider as a matter of law, any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf.
 
 
 19
 Id. at 113-114, 102 S.Ct. at 876-77 (emphasis in original and added).
 
 
 20
 I find the jury's note and its mistake and confusion in our case squarely to fit within the teaching of Lockett and especially Eddings. Although the jurors had been properly instructed, the understanding of eleven of them-shades of Eddings-was "as if the trial judge had instructed [them] to disregard the mitigating evidence [McDowell] proffered on his behalf." Id. I repeat the jury's note in relevant part:
 
 
 21
 We have an 11 to 1 vote for death. The one juror empathically [sic] feels her mitigating circumstances are equal to the aggravating circumstances. The other 11 jurors do not all agree with the one juror[']s mitigating circumstances as being either testimony or evidence that should be considered. Please advise which following circumstances can be considered mitigating circumstances.
 
 
 22
 (emphasis added). A list of factors then followed in the note, most of which clearly qualify under Lockett and Eddings as mitigating evidence. See Skipper v. South Carolina 476 U.S. 1, 4-5, 106 S.Ct. 1669, 1670-71, 90 L.Ed.2d 1 (1986) (evidence is mitigating if it "might serve 'as a basis for a sentence less than death' ") (quoting Lockett, 438 U.S. at 601, 98 S.Ct. at 2962). Both McDowell's counsel and the prosecutor so advised the trial judge. The prosecutor did so while the jury was still present in court after the court's response as quoted by Judge Thompson. The prosecutor forthrightly said, "Well, I don't know if it is taking sides but those [factors listed by the jurors] are proper factors to consider." McDowell's counsel requested that the jurors be told that the matters to which the note referred could be considered as mitigating. Thus, everyone in the courtroom understood that the defendant's mitigating evidence must be considered by the jury, everyone, that is, except eleven of the jurors-the most important participants at that stage of the proceedings.
 
 
 23
 The question, then, is whether the trial judge's response to the jury's note adequately corrected the eleven jurors' misunderstanding and dispelled the confusion. On reflection, I conclude on these facts, in these circumstances, and in the light of controlling authority, that it did not, and I so conclude for two main reasons.
 
 
 24
 First, although the judge referred the jurors to the instructions defining mitigating circumstances, these are the same instructions that for some unknown reason eleven of the jurors did not correctly understand or interpret in the first place. The trial judge made no effort to identify the exact problem confounding the eleven jurors in order to remedy it. On this point, I agree with Justice Broussard of the California Supreme Court: "There is no point in reiterating language which has failed to enlighten the jury." People v. McDowell, 46 Cal.3d 551, 250 Cal.Rptr. 530, 763 P.2d 1269 (1988) (Broussard, J., dissenting.)
 
 
 25
 Second, we have no idea whether the jurors then read the instructions, but even presuming that they did, the record gives us no assurance whatsoever that having done so, the mistake was corrected. All we know for sure is that the eleven jurors who initially did not understand that the law required them to consider McDowell's mitigating evidence ended up voting as they had while under the influence of their initial error. Under these circumstances, it would be sheer folly to presume-as we usually do-that they finally got it right and followed the instructions.
 
 
 26
 Using the test of Boyde v. California, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) as a guide, I conclude "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevent[ed] the consideration of constitutionally relevant evidence."[1] Id. at 380, 110 S.Ct. at 1197.
 
 
 27
 Although I understand and sympathize with the trial judge's appropriate worry about saying anything that might coerce the jurors towards a verdict, the response given to their question simply did not clear away the juror's difficulty "with concrete accuracy." Bollenbach, 326 U.S. at 612-13, 66 S.Ct. at 405-06. I fully realize as does Judge Thompson that the manner in which this clarifying task must be done is within the sound discretion of the district court, and that the Courts of Appeal have approved in some cases the practice of simply rereading or referring the jurors to the instructions already read, but none of those cases in their facts and circumstances are on a par with the instant case. In United States v. Collom, 614 F.2d 624, 631 (9th Cir.1979), for example, the jury's question did not relate to a matter of constitutional concern, and the meaning of the note was merely "unclear." Consequently, we found no abuse of discretion in the trial judge's response, which was to reread the relevant instructions and to invite further questions "should the confusion persist." Id. at 631. Collom is easily distinguishable from our case.
 
 
 28
 McDowell's case is akin to United States v. Warren, 984 F.2d 325 (9th Cir.1993) wherein we held that
 
 
 29
 [i]n responding to the jury's inquiry in [the circumstances of that case] "it [was] not sufficient for the court to rely on more general statements in its prior charge." United States v. Nunez, 889 F.2d 1564, 1568 (6th Cir.1989). Referring the jury back to the original instruction would not correct the apparent impression of at least some jurors that intent "to hurt" rather than "to kill" might be sufficient to convict Warren of first degree murder. The Court should have provided a supplemental instruction sufficient to clear up the uncertainty that the jury had brought to the court's attention. Id.[2]
 
 
 30
 Id. at 330.
 
 
 31
 There is no one-size-fits-all response to jury disorientation, and the sizes that may fit other facts and circumstances do not fit this case. As the Supreme Court has said many times, "the penalty of death is qualitatively different from any other sentence. We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." Lockett, 438 U.S. at 604, 98 S.Ct. at 2964 (internal quotations and citations omitted). To echo here what the Supreme Court said in Mills v. Maryland, 486 U.S. 367, 383-84, 108 S.Ct. 1860, 1869-70, 100 L.Ed.2d 384 (1988), "[n]o one on this court was a member of the jury that sentenced [Charles McDowell]. We cannot say with any degree of confidence which interpretation [of the instructions McDowell's jury] adopted [after meeting with the trial judge]. The possibility that petitioner's jury conducted its task improperly certainly is great enough to require resentencing." Id. at 384, 108 S.Ct. at 1870. Moreover, Mills observes that "[i]n reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds," citing Lockett, Id. at 376, 108 S.Ct. at 1866. The Mills Court also quotes from Andres v. United States, 333 U.S. 740, 752, 68 S.Ct. 880, 885, 92 L.Ed. 1055 (1948):That reasonable men might derive a meaning from the instructions given other than the proper meaning of [the statute] is probable. In death cases doubts such as those presented here should be resolved in favor of the accused.
 
 
 32
 The California Supreme Court observed that the trial court "properly could have explained to the jury that it was free to consider any aspect of a defendant's background or character which defendant offered as a mitigating circumstance, and that some, if not all, of the listed factors, reasonably could fall within the category." People v. McDowell, 46 Cal.3d at 578, 250 Cal.Rptr. 530, 763 P.2d 1269. Not only "could" the trial judge have done this, but in my view, after Eddings he was required to do so to preserve McDowell's right to a proper decision by the jury grounded in the law. Accordingly, I would reverse the district court on this discrete issue.
 
 III
 
 33
 This conclusion requires me to address the State's argument that McDowell improperly asks us for the retroactive benefit of a new rule of constitutional law, in contravention of Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). I reject this argument. Eddings preceded McDowell's crime by five months, and his trial by over two years. The State's argument that we have never before elevated Bollenbach to a constitutional level is off-target. Bollenbach is not driving this case, Eddings is. The core constitutional issue here arises not from the behavior of the judge, but from the misunderstanding of the jurors. The inadequate response of the judge is germane only insofar as it did not ameliorate the condition threatening to deprive the defendant of his constitutional right to have the jury consider his evidence. McDowell's predicament in the main is no different than if the jury had not been properly instructed on mitigating circumstances. The holding I would reach neither "breaks new ground," nor is it something not "dictated by the precedent" existing before the defendant's trial. Graham v. Collins, 506 U.S. 461, 467, 113 S.Ct. 892, 897, 122 L.Ed.2d 260 (1993) (quoting Teague, 489 U.S. at 301, 109 S.Ct. at 1070).
 
 
 34
 Thus, I concur in the rest of Judge Thompson's opinion, but as to the judgment of death, I would reverse the district court and remand the matter to state court for a new penalty-phase trial.
 
 IV
 
 35
 Although I am quite sanguine about the legal accuracy and consequences of my analysis, the practical result is, to say the least, disturbing. The murder of Paula Rodriquez happened on May 20, 1982, almost 15 years ago to the day. McDowell's trial occurred in 1984, 13 years ago. The matter then went in sequence: to the California Supreme Court on automatic direct appeal (decided in 1990); the United States Supreme Court on a petition for a writ of certiorari (denied); back through California to the California Supreme Court on habeas (denied); then to the United States Supreme Court on a second petition for certiorari (denied); to federal district court on habeas; back to the State to exhaust his claims and to file a second state petition for habeas corpus (denied by the California Supreme Court); back to the federal district court for an extensive hearing (denied); and now to us.
 
 
 36
 The tortured history of this case and the amount of time it is taking to reach a final resolution makes our system of justice look more like an agonizing degenerative disease than a model of due process of law. I can only hope that the Antiterrorism and Effective Death Penalty Act, Pub.L. No. 104-132, 110 Stat. 1214 (1996), will bring this variety of glacial litigation under control.
 
 
 37
 Given how long it takes to bring cases like this to closure, it is little surprise that the public's confidence in its system of justice is not what it should be. With nine vacancies out of twenty-eight authorized judges in the United States Court of Appeal for the Ninth Circuit, however, one wonders how Congress and the President expect us promptly to process our ever increasing 8000-plus caseload, which will include in the foreseeable future over 700 death penalty cases. Our current 9 vacancies mean we will process 1500 fewer cases this year than we could with a full bench. To the litigants who wait in line for us to resolve their disputes, this unnecessary disability is unpardonable. At the very least, the President and Congress must quickly fill the vacancies on the federal courts, which by September of this year will increase to 10 appellate judges in our circuit (over one-third of our authorized strength). In a country that prides itself on being a nation of laws rather than just a nation of leaders, and which exalts the rule of law as the appropriate method of resolving controversies, we must do better in keeping our civil and criminal justice system able without unnecessary delay to deliver to the People the important promises of our Constitution.
 
 
 
 [1]
 Parenthetically, the Supreme Court in Boyde had to presume confusion from an ambiguous instruction, id.; here we know eleven of the jurors were proceeding on an erroneous premise
 
 
 [2]
 See also United States v. Gordon, 844 F.2d 1397, 1401-02 (9th Cir.1988) (error to rely on original instruction where jury expressed confusion regarding conspiracy counts); United States v. Walker, 575 F.2d 209, 213 (9th Cir.1978) (trial court's response to jury confusion about a controlling legal principle was insufficient because it failed to eliminate that confusion); United States v. Bolden, 514 F.2d 1301, 1308-09 (D.C.Cir.1975); (trial court rereading statute and standard instruction was insufficient where jury showed confusion); United States v. Petersen, 513 F.2d 1133, 1136 (9th Cir.1975) (giving cursory supplemental instruction in face of jury confusion was insufficient); Powell v. United States, 347 F.2d 156, 157-58 (9th Cir.1965) (responding to a jury's inquiry by merely rereading a facially correct instruction is inadequate)